COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE ORACLE CORPORATION DERIVATIVE LITIGATION

Consolidated
C.A. No. 2017-0337-SG

## MEMORANDUM OPINION

Date Submitted: December 22, 2022
Date Decided: May 12, 2023

Joel Friedlander, Jeffrey M. Gorris, and David Hahn, of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; OF COUNSEL: Randall J. Baron and David A. Knotts, of ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, of ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; Gregory Del Gaizo, of ROBBINS LLP, San Diego, California, *Attorneys for Lead Plaintiffs Firemen's Retirement System of St. Louis and Robert Jessup*.

Blake Rohrbacher and Susan M. Hannigan, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Nominal Defendant Oracle Corporation*.

Elena C. Norman, Richard J. Thomas, and Alberto E. Chávez, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Peter A. Wald, of LATHAM & WATKINS LLP, San Francisco, California; Blair Connelly, of LATHAM & WATKINS LLP, New York, New York, *Attorneys for Defendants Lawrence J. Ellison and Safra A. Catz*.

GLASSCOCK, Vice Chancellor

In this derivative matter, the Plaintiff stockholders of Oracle Corporation allege that Oracle overpaid to acquire NetSuite Corporation. They seek damages on behalf of Oracle. The initial complaint was filed on May 3, 2017, and has been vigorously litigated[1] since. The matter has been tried. What follows is my post-trial decision.

At its heart, the instant complaint alleges that Defendant Larry Ellison, the founder and a director and officer of Oracle, used his outsized influence at the company to cause it to acquire NetSuite at a premium. Because he owned a larger percentage of NetSuite than he did Oracle, it was in his interest, financially at least, that Oracle overpay. Because Ellison, per Plaintiffs, was a conflicted controller, the transaction must be reviewed under the entire fairness standard, a burden (again per Plaintiffs) that Ellison and his co-Defendant Oracle CEO Safra Catz cannot carry.

I find based on the trial record that Ellison, a corporate fiduciary, withdrew from Oracle's consideration of the NetSuite acquisition just before the initial presentation to the Oracle board, and that the remaining directors empowered a special committee to conduct the negotiation of any acquisition of NetSuite. This is adequate to cleanse Ellison's conflict as a director and officer standing on both sides

---

[1] The matter was stayed to accommodate consideration of the derivative claim by a special litigation committee on Oracle's behalf.

1

of the transaction. The Plaintiffs assert, however, that these actions cannot remove the review of the transaction from the purview of entire fairness, because Ellison must be viewed as a controller.

This Court has had many occasions to comment on the fiduciary duties of corporate controllers. Nonetheless, our jurisprudence is not entirely clear.[2] My understanding may be summarized as follows. A stockholder who owns a majority of the voting stock of a company, or who, as a result of voting ability combined with other opportunities, may control the actions of the board, nonetheless remains a stockholder to whom fiduciary duties *run*, from the directors and the officers. As fiduciaries potentially subject to conflicts with respect to corporate decisions, the directors and officers are held to a standard of fidelity to the entity and the stockholders. Where these fiduciaries cause the corporation to engage in a transaction in which they are conflicted, they are liable unless the transaction was entirely fair.[3] But when does a controlling stockholder become liable *herself* for fiduciary duties to the entity?

The answer is: when the control that the stockholder enjoys over the directors is leveraged by the stockholder in a way that diminishes the directors' ability to bring

---

[2] *See* Lawrence A. Hammermesh, Jack B. Jacobs, and Leo E. Strine, Jr., *Optimizing the World's Leading Corporate Law: A Twenty-Year Retrospective and Look Ahead*, 77 Bus. Law. 321, 339 (2022) (discussing the development of the inherent coercion doctrine).
[3] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710–11 (Del. 1983).

business judgment to bear on the exercise of their duties. In that scenario, the controlling stockholder exercises dominion over the property of others—the minority stockholders—and thus becomes a fiduciary herself. At the pleading stage, the well-pled allegation of a controller who receives a non-ratable benefit is typically sufficient to defeat a motion to dismiss, absent employment of procedural safeguards that replicate an arms-length transaction.[4] This is because of the inherently-coercive nature of the presence of a controller who can benefit from a transaction, with respect to the directors whom she is able to control.[5] The resulting conflicted transaction is subject to entire fairness review, accordingly.

The coercive nature of the conflicted controller applies most compellingly in the case of a squeeze-out merger. The instant case involves an acquisition *by*, not a sale *of*, Oracle. Nonetheless, decisions of this Court hold that the inherent coercion rationale applies in such transactions with a conflicted controller, compelling entire fairness review.[6] Under the *Ezcorp* rationale, if Ellison was a controller, and if the protections of *MFW* (requiring negotiation and approval by a special committee of independent directors and approval by a majority of the non-controlled shares) were

---

[4] *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016); *see Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 645 (Del. 2014).
[5] *Ezcorp*, 2016 WL 301245, at *11.
[6] *See id.* at *11–30 (explaining inherent coercion in the context of controller cases).

3

not in place, entire fairness review must result. The transaction under review here did not require, or involve, a stockholder vote.[7]

Ellison is not a majority stockholder of Oracle. Our caselaw has recognized that, in certain scenarios, minority stockholders may be deemed controllers if they have control of the corporate machinery which they employ for their own benefit, even without the ability to oust the directors by majority vote. The Plaintiffs allege that one such example is present here: a large blockholder, also a director and officer, who, as founder, is so identified with the company and so respected by the other directors and officers that he has the ability to influence decisions of the board to an extent that fiduciary duties attach, for the reasons expressed above. In case-dispositive motion practice, I found the facts alleged (and in the case of summary judgment, the factual issues remaining) sufficient to bring this matter to trial. In deciding the standard of review post-trial, I must determine, on a full and final record, whether Ellison was a controller.

---

[7] Because I find Ellison was not a controller and did not attempt to control the transaction at issue, I need not decide whether the existence of a well-functioning special committee can cleanse a non-squeeze out transaction involving a conflicted controller, which did not require a stockholder vote.

Ellison held roughly a quarter[8] of the voting equity of Oracle. He was not in control of Oracle generally; he relinquished even executive control in 2014 when he resigned as CEO and became Oracle's Chief Technology Officer. The evidence demonstrates that he did not control Oracle, and that he absented himself from the acquisition of NetSuite. Moreover, the directors appointed a special committee, and I find that body well-functioning and independent of Ellison.

Ellison is a force at Oracle, no doubt; he is the main creative party and a face of the company. I acknowledge that it is plausible that Ellison *could have* influenced the directors' decision here, had he made an effort to do so, which he did not. The concept that an individual—without voting control of an entity, who does not generally control the entity, and who absents himself from a conflicted transaction—is subject to entire fairness review as a fiduciary *solely* because he is a respected figure with a potential to assert influence over the directors, is not Delaware law, as I understand it.

All application of equity involves a balance of interests. In a perfect world, the standard of review would be applied in such a way that the onerous burden of entire fairness would never be imposed where directors could and did apply their

---

[8] "As of September 19, 2016, Ellison beneficially held 1,166,041,236 shares of Oracle common stock, an approximate ownership stake in Oracle of 28.4%." Joint Pre-Trial Order ¶ 46, Dkt. No. 734.

untainted business judgment on the corporation's behalf, but would always be imposed where they could not. In reality, a court of equity can only aspire to approach that ideal; thus the presumption of inherent coercion in the context of a controller who receives a non-ratable benefit from a corporate transaction. Plaintiff-friendly presumptions were sufficient to carry this matter to trial, but post-trial I find that Ellison was not a controller and that the facts do not invoke entire fairness.

That does not end the matter. Ellison is a fiduciary, as an officer and director of Oracle; Catz, as CEO and a director, is also bound by fiduciary duties. The Plaintiffs allege that both breached duties of loyalty by misinforming the Special Committee, to conceal material facts regarding the acquisition on behalf of Oracle, thus defrauding the Special Committee and invoking entire fairness review. In that scenario, the Defendants would be liable for damages for breach of the duty of loyalty. On the evidence presented at trial, I find those allegations unsupported as well.

My reasoning follows.

6

# I. BACKGROUND

## A. *Factual Background*

The following factual findings were either stipulated to by the parties or proven by a preponderance of the evidence at trial.[9]  Trial lasted ten days.[10]

### 1. Ellison, the Companies, and the Industry

Nominal Defendant Oracle Corporation ("Oracle") is a Delaware incorporated, California headquartered technology company in the business of selling hardware, software, and cloud computing products.[11]  Defendant Lawrence J. Ellison founded Oracle in 1977 and has served on its board of directors since that time.[12]  Ellison also served as Oracle's CEO until September 2014 when he assumed

---

[9] Citations in the form of "JX__ at __" refer to exhibits jointly submitted at trial, they are referred to according to the numbers provided on the parties' joint exhibit list and with page numbers derived from the stamp on each JX page.  Citations in the form of "PTO __" refer to paragraphs in the Joint Pre-Trial Order, Dkt. No. 734.  Citations in the form of "Tr. __:__ refer to Trial Transcript - Volume I, Dkt. No. 769, Trial Transcript - Volume II, Dkt. No. 770, Trial Transcript - Volume III, Dkt. No. 771, Trial Transcript - Volume IV, Dkt. No. 772, Trial Transcript - Volume V, Dkt. No. 772, Trial Transcript - Volume VI, Dkt. 774, Trial Transcript - Volume VII, Dkt. No. 775, Trial Transcript - Volume VIII, Dkt. No. 776, Trial Transcript - Volume IX, Dkt. No. 777, Trial Transcript - Volume X, Dkt. No. 778.
[10] *See* Tr. 2636.
[11] PTO ¶ 51.
[12] PTO ¶ 44.

the role of Chief Technology Officer and Executive Chairman of the Board.[13]  Catz became CEO at that time.[14]

Starting in the 2000's, Oracle ramped up its strategy of growth by acquiring other companies.[15]  Strategic acquisitions allowed Oracle to minimize the risks of research and development, which are particularly pronounced for companies in the enterprise resource planning ("ERP") space, in part because of the stickiness of customers.[16]  ERP software allows businesses to automate and manage business processes such as accounting, risk management, and supply chain operations.

Between 2006 and 2015, Oracle closed 111 acquisitions,[17] through which it purchased both revenue and products.[18]  In 2006, Doug Kehring became Oracle's Head of Corporate Development[19] and institutionalized Oracle's mergers and acquisitions strategy by implementing a standard framework to assess potential targets.[20]  As part of this framework, Oracle's Corporate Development team kept

---

[13] PTO ¶ 44.
[14] PTO ¶ 49.  Catz served as co-CEO with Hurd until the death of the latter in 2019.
[15] Tr. 530:5–531:24; JX2469 at 8; JX391 at 11.
[16] *See* Tr. 2668:12-2670:13.
[17] JX612 at 12.
[18] Tr. 530:9–535:18.
[19] Tr. 529:21–531:2.
[20] Tr. 529:11–531:2, 549:20–23, 551:14–552:20.

dossiers on potential takeover targets which it routinely kept up to date.[21] One of those monitored companies was NetSuite.

### 2. NetSuite, the Target

Prior to its acquisition by Oracle, NetSuite was a Delaware-incorporated, California headquartered company in the business of selling cloud-based financials/ERP and omnichannel commerce software suites.[22]

More than 20 years after Oracle's formation, Ellison co-founded NetSuite with Evan Goldberg, a former Oracle employee, in 1998.[23] Both Oracle and NetSuite sell, and at the time of the transaction sold, ERP software. Oracle primarily sold on-premises customized products to large customers,[24] and NetSuite primarily sold off-the-shelf cloud-based software to smaller customers.[25]

---

[21] *See* Tr. 455:5–14.
[22] PTO ¶ 56.
[23] PTO ¶ 57; Tr. 1831:17–1832:3.
[24] JX2470 at 24–40, 83–87.
[25] JX2470 at 40–49, 83–87.

9

### 3. Oracle Considers Acquiring NetSuite

At the time of the transaction, Ellison owned approximately 28.4% of Oracle common stock[26] and 39.8% of NetSuite stock.[27]

Ellison was a longtime proponent of an Oracle acquisition of NetSuite and regularly made this known to "anyone who would listen" and "even to people who wouldn't."[28] This included officers and directors at both NetSuite and Oracle.[29] As far as Ellison was concerned, the question was when, not if, the acquisition should occur.[30]

After Ellison stepped down as Oracle's CEO in 2014,[31] discussions at Oracle of whether to purchase NetSuite began in earnest.[32] In February 2015, Ellison and Oracle's co-CEOs, Mark Hurd and Safra Catz, met to discuss a potential acquisition of NetSuite, but determined the timing was not right.[33] While Hurd supported the

---

[26] PTO ¶ 46 ("As of September 19, 2016, Ellison beneficially held 1,166,041,236 shares of Oracle common stock, an approximate ownership stake in Oracle of 28.4%.").

[27] PTO ¶ 48 ("As of February 28, 2015, through NetSuite Restricted Holdings LLC, Ellison held 31,964,891 shares (41.3%) of NetSuite's common stock. When combined with 5,660,599 shares held by his family members, trusts for their benefit, and related entities, Ellison and his affiliates beneficially owned, in aggregate, roughly 48.6% of NetSuite's common stock as of February 28, 2015.").

[28] Tr. 1664:15–23, 1980:4–15.

[29] Tr. 1664:15–23.

[30] Tr. 1953:1–5 ("To me, it was simply a matter of the right timing.").

[31] PTO ¶ 49. Hurd passed away in 2019 prior to the opportunity to take his testimony in this action.

[32] JX328 at 1–3; JX400 at 1–2; Tr. 577:19-583:4.

[33] Tr. 1959:24–1963:9.

purchase of NetSuite at that time, Catz was neutral if not slightly opposed, and Ellison was strongly opposed to a transaction.[34] Ellison's reasons for opposing a deal at that date were several and ultimately echoed by Catz.[35] At the time, NetSuite was trading at a multiple that would have made a deal dilutive to Oracle's earnings.[36] Ellison also believed that Oracle was in a state of transition and a transaction between Oracle and NetSuite had the potential to both distract management and cause "confusion in the marketplace."[37]

Oracle, which had primarily functioned by licensing its software to customers who ran that software on their own on premises machines,[38] determined that a sea change was occurring with the development of cloud computing.[39] This allowed cloud-based product offerings that were sold by subscription rather than license.[40] Oracle's cloud-based ERP product, Fusion, was a ground-up rewrite of its software that took around ten years to develop.[41] In 2015, Fusion was just gaining traction in

---

[34] Tr. 1962:8–19.
[35] Tr. 1407:9–1408:5.
[36] Tr. 1960:14–1961:19.
[37] Notice of Lodging of Dep. Transcripts and Video Recordings Ex. 23, at 67:14–68:2, Dkt. No. 731; Tr. 1956:8–1957:3.
[38] Tr. 534:18–536:5.
[39] Tr. 535:5–14.
[40] Tr. 535:19–536:5.
[41] Tr. 1772:24–1773:2, 1899:5–23.

the market.[42]  Ellison feared that if Oracle purchased NetSuite, a cloud ERP company, it would hinder the rollout of Oracle's similar product.

As a result of this discussion, Oracle did not pursue an acquisition of NetSuite in 2015.

### 4. NetSuite Struggles to Meet Projections

On July 8, 2015, Ellison called Goldberg and expressed concern with NetSuite's direction.[43]  Ellison criticized NetSuite's growth rate, stating that Oracle was going to "crush" NetSuite and that Workday, another tech company, had "blown by" NetSuite.[44]  Similarly, Ellison expressed concern with NetSuite's ability to compete in its up-market, and with the company's lack of verticals.[45]

In September 2015, NetSuite was not meeting the projections that its CEO Zachary Nelson had set for year-on-year bookings increases.[46]  The original expectation was a 35 percent year-on-year increase in bookings for 2015, 2016, and

---

[42] Tr. 1773:3–1774:15.  Oracle launched Fusion in 2011.
[43] JX485 at 3–4; JX484; Tr. 793:5–796:5.
[44] JX485 at 3–4; JX484; Tr. 793:5–796:5.
[45] JX485 at 3–4; JX484; Tr. 793:5–796:5.
[46] JX528 at 60.

2017, but NetSuite adjusted that target down to 25 percent for those three years.[47] Ellison was aware of and displeased by this change.[48]

The slowdown in bookings was caused by NetSuite's pursuit of customers who required significant customization.[49] Although these customers brought in revenue for customization, that revenue was non-recurring and low margin.[50] Further, the required customization bogged down implementation.[51]

### 5. Ellison Redirects NetSuite

To counter NetSuite's now flagging growth numbers, Ellison laid out (with Goldberg, Jim McGeever, and Nelson) a strategy of investment in verticals and micro-verticals,[52] which he and NetSuite President McGeever had previously recommended.[53]

The result was Project Atlas, NetSuite's implementation of Ellison and McGeever's plans to invest in verticals and micro-verticals. Project Atlas, later

---

[47] JX528 at 60.
[48] Tr. 1943:3–1944:9.
[49] Tr. 920:3–921:3, 1781:13–1782:12, 1787:7–1788:13, 1790:3–1792:3.
[50] Tr. 884:21-886:10; 1778:4–1781:10.
[51] Tr. 1037:15-1038:19.
[52] JX549. Verticals and micro-verticals are specialized slivers of markets/industries that could be beneficially addressed with limited customization after building features for those markets. Tr. 607:15–24.
[53] Tr. 1921:13–24, 900:2–901:13.

13

called SuiteSuccess, was a tool to streamline sales and implementation of NetSuite.[54] The goal was to "sell what [NetSuite] delivered and deliver what [NetSuite] sell[s]."[55] Rather than spending time creating "a flashy demo" based on a guess of what the customer wanted, wiping the slate clean, and then building software based on customer conversations, SuiteSuccess was created to sell prebuilt software designed for the customer's industry.[56] This process would only leave the "last-mile implementation" for each customer to tailor the software to "the things that were very unique to their situation."[57] The benefit to the customer was less implementation and thus lower upfront cost and time.[58] The benefit to NetSuite was less low-margin implementation fees, less time to implement, and improved customer sentiment.[59] To do this, Atlas/SuiteSuccess focused on verticals and would be most efficient where limited customization was required.[60] The Atlas plan was focused on building out these verticals for specific industries, with the intention of doing one to two per year.[61]

---

[54] Tr. 910:22–913:2.
[55] Tr. 912:2–5.
[56] Tr. 912:2–913:2.
[57] Tr. 912:17–913:2.
[58] Tr. 910:22–913:2, 936:3–938:10.
[59] Tr. 919:3–920:21, 936:3–938:10; *see* Tr. 910:22–913:2.
[60] Tr. 916:18–917:1.
[61] Tr. 752:17–754:16, 921:4–14.

### 6. The 2016 Negotiation and Tender Offer

#### a. The Preliminary Stages

On January 14–15, 2016, the Oracle board held an annual offsite meeting at Porcupine Creek, Ellison's property in California.[62]  At that meeting, among other issues discussed, Kehring presented on three potential takeover targets, one of which was NetSuite.[63]  This was the first time that Oracle management approached the board with the proposal to purchase NetSuite.[64]

Prior to the presentation on NetSuite, Ellison left the room and recused himself from the discussion.[65]  Per Catz, at this time and prior to leaving the room, Ellison did not advocate for or against the acquisition, he was "not not supportive."[66]  The wind had shifted since 2015.  Specifically, Fusion had settled on the market and NetSuite had grown, but its trading price had decreased as a function of a market

---

[62] PTO ¶ 58.

[63] PTO ¶ 59; JX624 at 5–6.  Kehring also informed the board that negotiations with another takeover target had ceased.

[64] Tr. 463:5–7.  Management, including Ellison, discussed the potential NetSuite acquisition prior to adding it to the Porcupine Creek agenda.  Tr. 1416:1–9.

[65] JX624 at 6 ("Mr. Ellison noted that he would recuse himself from any discussions related to Napa-given his ownership interest in Napa.").  Plaintiff attempted to show that Ellison's recusal was ineffective, however, the evidence at trial showed that he left the meeting.  Tr. 1415:9–24, 1136:2–9, 40:4–23.

[66] Tr. 1661:23–1662:21, 1665:17–1666:21.

wide software as a service ("SaaS") downturn.[67] As a result, 2016 NetSuite was a more attractive acquisition target than 2015 NetSuite had been.

After Ellison left the room, the board, Catz, Hurd, and Kehring discussed the strategic benefits and challenges associated with a potential transaction involving NetSuite.[68] Following the discussion, the Oracle board decided to continue to explore a potential transaction involving NetSuite, and directed Catz and Hurd to assess NetSuite's interest in an acquisition.[69] However, the board instructed the co-CEOs not to discuss price.[70]

Catz then set up a dinner with NetSuite's CEO, Zachary Nelson, for January 19, 2016.[71] Although the Oracle board instructed Catz not to discuss price, on the day of the meeting, Kehring sent Catz a presentation that included an accretion/dilution analysis and other information about NetSuite.[72] At dinner, Catz asked Nelson if NetSuite would be open to an offer for Oracle to purchase NetSuite.[73] Nelson testified that his response was that an acquisition would have to garner a "Concur-type multiple," a revenue multiple similar to what SAP, another

---

[67] Tr. 1967:9–1971:2, 587:15–588:24, 1410:3–21; JX716 at 1, 6.
[68] JX624 at 6.
[69] JX624 at 6.
[70] JX624 at 6.
[71] JX630.
[72] JX633.
[73] Tr. 1425:17–1429:3.

16

technology company, paid for Concur Technologies in 2014.[74] As the Oracle board had instructed, Catz did not engage with Nelson in substantive price negotiations[75] or make an offer at this initial meeting.[76]

Nelson followed up with Catz by telephone on each of the next two days.[77] Both phone calls lasted twelve minutes.[78] Although Nelson again mentioned the "Concur multiple," he did not explain what it meant or express it in dollars per share.[79] While the evidence was in conflict as to these discussions, I find based on the preponderance of the evidence that, beyond Nelson's mention of the "Concur-Type" multiple, Catz did not engage with Nelson in price discussions.[80] Instead, the

---

[74] Tr. 1062:5–1063:4.

[75] Nelson testified "And I brought up the subject that, you know, we would expect something at least as high as what SAP paid for Concur, which was a recent transaction in the marketplace. And she said, well, what does that equate to? I said, oh, it's something like — this is all sort of off the cuff — something like ten times revenue. And she said, well, what does that mean in terms of stock price? And that, I didn't really have. I sort of did some quick math in my head. I said, it's something like 100 or $125 a share. And as I recall, she said, wow, that's a big number. And that was really sort where we left it . . . . She didn't [give any indication about price], other than to say, wow, that's a big number." Tr. 1062:14–1063:6. Catz testified that she did not believe the Concur multiple was mentioned at dinner. Tr. 1428:6–20.

[76] Tr. 1436:19–1437:1.

[77] JX2435. Nelson and Catz also exchanged text messages on the 23rd. Tr. 1620:1–12.

[78] Tr. 1620:1–12; JX2435.

[79] Tr. 1432:1–1433:12.

[80] See Tr. 1620:1–23. Unofficial notes from a NetSuite board meeting held on January 25 mention the Concur multiple and list "Z at $120. S more at $100." JX703 at 2. Non-contemporaneous internal documents at T. Rowe Price ("TRP"), a major NetSuite stockholder, reference a Catz-Nelson discussion of a $100 to $125 per share price range. JX1541 at 1; JX1555 at 4. These numbers are likely derived from the Concur multiple, and when coupled with Catz and Nelson's believable testimony that Catz did not proffer a price, they suggest that a specific price range was not discussed. See Tr. 1431:20–1433:12, 1620:13–1621:5.

pair primarily discussed that Ellison's former NetSuite co-founder, Evan Goldberg—NetSuite's Chief Technology Officer and Chairman of the Board[81]—was unwilling to sell.[82]

Eight days after Catz's dinner with Nelson, on January 27, 2016, Goldberg called Ellison on the telephone[83] and asked whether Oracle's decision to pursue NetSuite was punishment.[84] Ellison replied in the negative and explained that Oracle and NetSuite together "could be more successful than . . . separate."[85] Nonetheless, Goldberg was not excited about a potential return to Oracle, a company he left almost 20 years earlier.[86] Goldberg was used to, and enjoyed, being his own boss.[87] He was unhappy about the potential of coming back to Oracle where he would once again be a subordinate.[88] Goldberg was concerned about NetSuite's level of

---

[81] PTO ¶ 57.
[82] Tr. 1620:1–1622:1 ("Then the next day or the day after that, I start hearing about Evan. And Evan came back, it's just about Evan. That's what the conversations were all about.").
[83] Tr. 834:5–9.
[84] Tr. 834:10–12. A prior unrelated interpersonal issue sat in the background of this phone call. Tr. 781:1–24. Ellison said, "I mean, he and I had very different points of view on a specific issue, and neither one of us are shy about expressing our views." Tr. 1832:4–21.
[85] Tr. 834:13–16.
[86] Tr. 1831:17–1832:3.
[87] Tr. 1831:17–1832:3.
[88] Tr. 1831:17–1832:3.

independence following a potential acquisition, and whether NetSuite would be a Global Business Unit ("GBU"), and thus retain some autonomy, if acquired.[89]

Ellison assured Goldberg that, in the event of a transaction, Oracle's intention was to retain NetSuite's management team with Goldberg at the helm, that Goldberg would report to Hurd, or Ellison if he preferred, and that Hurd "liked running the larger acquisitions as global business units."[90] Further, Ellison provided some insight into Oracle's strategy for NetSuite post acquisition, which included building out a human capital management product, exporting NetSuite to more countries, creating more verticals, and generally increasing the company's growth rate.[91] Ellison told Goldberg that he would not "force [him] to do anything," which Goldberg took to mean that the decision to sell was properly with NetSuite's directors and officers.[92] In essence, Ellison told Goldberg that he was recusing from NetSuite's decision-making process. Goldberg reported the conversation and Ellison's intention to recuse from NetSuite's decision to the NetSuite board.[93]

---

[89] Tr. 834:17–835:15, 1679:1–1680:15. Rather than coalescing into Oracle, many of Oracle's acquisitions operate as GBUs, which sit under Oracle's umbrella, answer to Oracle management, and use Oracle resources, but remain quasi-independent. Tr. 1831:9–16. Goldberg and Ellison had previously discussed NetSuite's level of independence following an Oracle acquisition. Tr. 1829:24–1831:8.
[90] Tr. 1679:1–1680:15, 1829:24–1831:8.
[91] Tr. 1679:21–1681:9.
[92] Tr. 836:4–22.
[93] JX1497 at 21; Tr. 1833:9–1834:20.

### b. The First Round of Offers

Following the January 15–16, 2016 offsite meeting at Porcupine Creek, Oracle's board began taking steps to prepare for negotiations with NetSuite. Oracle's directors completed a conflict questionnaire.[94] Counsel recommended Renee James, Leon Panetta and George Conrades, who each reported no conflicts,[95] to serve as an independent special committee (the "Special Committee") designated to negotiate the potential transaction with NetSuite (the "Transaction") on behalf of Oracle.[96]

On March 18, 2016, the Oracle board, except for Ellison who recused, met to discuss the creation of the Special Committee.[97] Catz reported NetSuite was open to a bid,[98] but she did not report the phone calls with Nelson or his mention of a "Concur multiple."[99] Ellison was not present and did not disclose his January 27, 2016, phone call with Goldberg.[100] The Oracle board approved the creation of the

---

[94] JX683; JX687; JX688.
[95] JX683; JX687; JX688.
[96] JX743.
[97] PTO ¶ 60.
[98] JX759 at 1.
[99] JX759 at 1; Tr. 1584:4–1585:7, 1625:12–1626:1 ("If it had been a demand, and I had considered it seriously in any way, I would have immediately told the board that there was nothing for us to talk about because a Concur multiple was not in the view of what we were thinking in January of 2016. The market had gone down dramatically at that time. And it didn't even register when he said it because had it, we would have had nothing to discuss.").
[100] Tr. 2001:20–2002:18.

20

Special Committee comprised of James, Panetta, and Conrades[101] and empowered it to:

    a) evaluate alternatives to the Potential Transaction, including alternative acquisition targets and internal development opportunities, available to the Corporation;

    b) establish, approve, modify, monitor and direct the process and procedures related to the negotiation, review and evaluation of the Potential Transaction, including the authority to determine not to proceed with any such process, procedures, review or evaluation;

    c) formulate, structure, propose and negotiate terms with respect to, and review, negotiate, evaluate and document the terms and conditions of, the Potential Transaction;

    d) determine on behalf of the Board and the Corporation whether the Potential Transaction is advisable and fair to, and is in the best interests of, the Corporation and its stockholders;

    e) reject or approve the Potential Transaction;

    f) effectuate the Potential Transaction; and

    g) take such other actions as the Special Committee may deem to be necessary or appropriate in order for the Special Committee to discharge its duties[.][102]

The Special Committee was further empowered to retain its own independent legal counsel, and to hire consultants and other advisors of its choosing.[103]

---

[101] PTO ¶ 60.

[102] JX759 at 2–3.

[103] JX759 at 3–5 ("6. The Special Committee is hereby authorized and empowered to retain independent legal counsel, at the expense of the Corporation, to advise it and assist it in connection with fulfilling its duties as delegated by the Board;

7. The Special Committee is hereby authorized and empowered to retain such other consultants and agents, including, without limitation, independent financial advisors, at the expense of the Corporation, as the Special Committee may deem necessary or appropriate to advise it and assist it in connection with fulfilling its duties as delegated by the Board and to perform such services and render such opinions as may be necessary or appropriate in order for the Special Committee to discharge such duties;

21

Over the course of the next seven months, the Special Committee met fifteen times to assess the Transaction.[104] On April 8, 2016, the Special Committee held a meeting, with Skadden, Arps, Slate, Meagher, and Flom LLP ("Skadden") and members of management, including Catz and Kehring, in attendance.[105] At this first meeting, the Special Committee elected James as its chair,[106] engaged Skadden as its independent legal advisor,[107] and heard from Catz and Kehring on the strategic rationale of the Transaction.[108] Kehring and the Corporate Development team created a Powerpoint presentation which Catz presented to the board.[109] The presentation noted the

---

8. The Special Committee is hereby authorized and empowered to enter into (and to cause the Corporation to enter into) such contracts providing for the retention, compensation, reimbursement of expenses and indemnification of such legal counsel, investment bankers, consultants and agents as the Special Committee may deem necessary or appropriate, and that the Corporation is hereby authorized and directed to pay all fees, expenses and disbursements of such legal counsel, investment bankers, consultants and agents on presentation of statements approved by the Special Committee, and that the Corporation shall pay all fees, expenses, and disbursements of such legal counsel, investment bankers, consultants, and agents and shall honor all other obligations of the Corporation under such contracts; and any such contract entered into (or approved) by the Special Committee is hereby approved, adopted, confirmed and ratified, and, to the extent necessary or appropriate, the officers of the Corporation are hereby authorized and directed to execute any such contract, for and on behalf of the Corporation, and the execution shall represent the Corporation's acknowledgement and acceptance of the terms and conditions thereof;").

[104] Compendium of Defendants' Trial Demonstratives Ex. 9, Dkt. No. 764.
[105] JX779 at 1. Catz and Kehring were only present for the discussion of the strategic rationale of the Transaction. Skadden was not present for the discussion of and vote to retain its legal services.
[106] PTO ¶ 64.
[107] PTO ¶ 65.
[108] JX779 at 2–3.
[109] JX820 at 2–9.

22

importance of keeping pace, the complementary nature of the two companies' offerings, and the synergies available by virtue of Oracle's infrastructure.[110]

After reviewing four potential independent financial advisors and narrowing the choice to Evercore Group LLC ("Evercore") and Moelis & Company LLC ("Moelis"), the Special Committee held a meeting on April 19, 2016 to determine which advisor to engage.[111] Members of Evercore, members of Moelis, and lawyers from Skadden were in attendance.[112] Each of the two finalists proposed a contingent fee structure and the Special Committee determined that this structure benefited Oracle because of the possibility that a transaction would not occur.[113] The Special Committee discussed whether there "were any personal or financial conflicts that would call into question the independence of each of the potential financial advisors."[114] Ultimately, the Special Committee engaged Moelis based on that firm's emphasis on alternatives to the Transaction, including no acquisition; its demonstrated ability to challenge management; and its commitment to devote senior management attention to the Special

---

[110] JX820 at 3.
[111] PTO ¶ 66; *see* JX779 at 2–3; JX797 at 1–4.
[112] JX797 at 1.
[113] JX797 at 2.
[114] JX797 at 3.

Committee's needs.[115]  In exchange for its assistance, Moelis was to receive $1 million if the engagement did not result in an acquisition and $17 million if it did.[116]

On April 26, 2016, Moelis began its diligence by asking Catz and Kehring a series of prepared questions.[117]  Moelis's intent was to begin by evaluating Oracle, its present and future capabilities, its customers, its geographic goals, the ERP/SaaS landscape, and alternatives to the Proposed Transaction.[118]  After examining Oracle and the market generally, Moelis was to move to an examination of NetSuite based on public and available non-public information.[119]

On May 5, 2016, James joined Moelis, Skadden, Kehring, and two other Oracle employees for an all-day diligence session with NetSuite representatives.[120]  Based on its research, Moelis concluded that although Fusion was seeing success in the "enterprise" and "near enterprise" market,

---

[115] JX797 at 3.
[116] JX912 at 2; Tr. 2525:8–2526:21.  The Special Committee was also able to negotiate a reduction in Moelis's fee.  Tr. 2343:1–19.
[117] JX815.
[118] JX815 at 5.
[119] JX815 at 5.
[120] PTO § 68.

24

that is, with larger companies,[121] it was not as well received by small and medium-sized businesses.[122] In its evaluation of NetSuite, Moelis determined that NetSuite was strong in the areas where Fusion was weak.[123]

While Oracle's target customer base was the Fortune 500,[124] NetSuite's target customer base has "affectionally been referred to as the Fortune 5 million."[125] That is not to say that NetSuite did not serve or sell to large customers.[126] While the bulk of NetSuite's business was the mid-market,[127]

---

[121] Tr. 2349:16–2350:8 ("So those larger like medium, mid-market companies that were leaning more towards size and capabilities like the enterprise, that's where Oracle was seeing—to the extent they were seeing success, that's where they were seeing success.").

[122] Tr. 2349:16–2350:8 ("In that mid-market, though, in sort of the bulk of the market in the SME market, that's not where their product was showing great traction.").

[123] Tr. 2351:10–2352:1 ("Again, just the opposite. Having great success. So when I think about that part of the market, they don't need all the feature functions that the large enterprises need . . . . they had a simpler feature function set that really met the needs of that middle market, and they were finding success there."); *see* Tr. 2513:24–2514:16.

[124] *See* JX2470 at 24–40, 83–87.

[125] Tr. 691:16–692:17.

[126] Tr. 996:22–997:6 ("Splunk, Slack, Spotify, Snapchat, Groupon, and Box, we would run the financials for those companies. And these were examples of the unicorn, well-known brand names that we would use to market to growing customers, to show them you could grow with us.").

[127] Tr. 721:23–722:6. Notably, there is no singular market size classification scheme within the industry (or even within each organization) and market size can be defined by either customer revenue or number of employees. In one stratification Oracle's up-market coalesced at above one billion dollars in revenue, the mid-market at 250 million to one billion dollars in revenue, and the small and medium business ("SMB") market at below 250 million dollars in revenue. Tr. 398:1–9. In another stratification, the mid-market was divisible at 1000 employees with the upper-mid-market occupying 1000-5000 employees or 50 million to three billion dollars in revenue and the lower-mid-market occupying under 1000 employees and below 50 million dollars in revenue. JX453 at 5. Markets were similarly squishy at NetSuite, Tr. 716:22–717:18, but its enterprise market encompassed companies with above 50 to 100 million dollars in revenue, Tr. 801:12–15. To NetSuite the mid-market was companies with between five million and 100 million dollars in revenue and up to 1000 employees. Tr. 800:17–801:11, 854:6–10.

the company also sold to larger organizations in a number of ways. NetSuite's sales team sold to larger customers because they had an incentive to do so.[128] Management did not push back because these larger customers came with benefits, and as the product got better, it was better able to serve larger customers.[129] However, these larger customers also came with downsides. As NetSuite's CFO, Ron Gill, phrased it, "larger customers will pull you towards features and functions for larger customers."[130] In other words, these larger customers require customization, which is non-recurring and low margin revenue.[131] Further, customization is time-consuming, and led to service backlogs, delayed implementation, and delayed revenue recognition.[132]

NetSuite also sought large customers in the form of subsidiaries of enterprise companies.[133] The distinction between selling to the enterprise's subsidiaries and the enterprise itself is known as two-tier deployment.[134] As described above, tier one was the replacement of the ERP system at a company's headquarters such that NetSuite would become the system of

---

[128] Tr. 722:21–723:13 ("The gravity is such that the sales organization will pull you up-market because they want to sell a larger deal.").
[129] Tr. 722:12–724:13.
[130] Tr. 722:21–723:1.
[131] Tr. 883:20–886:10, 1778:13–1781:10.
[132] Tr. 1037:15–1038:19.
[133] Tr. 742:24–743:21, 995:21–996:18.
[134] Tr. 921:19–922:13.

26

record for the entire company.[135]  Tier two was a sale to a subsidiary such that the enterprise would maintain their existing ERP but the subsidiary would use NetSuite.[136]  NetSuite's Enterprise Sales Team was thus tasked with selling to a subsidiary of a larger enterprise with the hope that implementation would go well and successive sales to that enterprise's other subsidiaries would follow.[137]

NetSuite made use of a "land and expand" strategy and took advantage of selling to smaller but growing customers.[138]  NetSuite was a full ERP suite; its smaller customers would adopt the software for its accounting functionality and would then expand to use other functionality.[139]  The use of these additional features fortified the business's reliance on NetSuite's ERP software and would increase the number of users, which increased NetSuite's revenue from that customer.[140]  Similarly, NetSuite's model of pay per user allowed its fees to grow as its customers grew.[141]

---

[135] Tr. 922:7–10.
[136] Tr. 921:22–922:6.
[137] Tr. 720:2–721:22.
[138] Tr. 880:24–882:13.
[139] Tr. 880:24–881:16.
[140] *See* Tr. 881:2–882:13.
[141] Tr. 881:2–882:13.

27

On May 13, 2016, the Special Committee held a meeting with Skadden in attendance.[142] No member of Oracle management was present.[143] James reported on the May 5 diligence session, noting the "potentially complementary nature of the two companies and their respective addressable markets."[144]

On May 20, 2016, the Special Committee held a meeting with lawyers from Skadden, members of Moelis, and members of Oracle management, including Catz and Kehring, in attendance.[145] Catz and Kehring gave a presentation on the importance of offering "best-of-breed" software, the need for further investment in ERP software so that Oracle could offer a "gracefully" migratable "spectrum of solutions," and NetSuite's strategic fit.[146] The presentation specifically noted, "[NetSuite] generally used by customers wanting a solution where robustness of services is most important" and "Oracle generally used by customers wanting a solution where robustness

---

[142] JX931 at 1.
[143] *See* JX931 at 1.
[144] JX931 at 1; Tr. 1154:1–1155:18 ("So I had learned from Mr. McGeever's presentation . . . how NetSuite viewed the market. And I think I had a fairly good view of Oracle's view of the market, and I was at Intel and Oracle prior to Fusion, the on-premise product user. So after listening to the presentation and seeing how they think about the market, versus how the market, you know, really works in enterprise software, I found them very complementary.").
[145] PTO § 69.
[146] JX947 at 4.

of software features is most important."[147] Oracle management recommended that the Special Committee move forward with the acquisition.[148] After management left the meeting, Moelis made a presentation to the Special Committee.[149] Moelis's presentation similarly touted that a NetSuite acquisition could "directly address the [Oracle] shortcomings in Cloud ERP," which "should be viewed as a strategic imperative."[150] The presentation noted that "Corporate IT spending is rapidly moving towards the Cloud and [Oracle] lacks a meaningful presence in Cloud ERP" but further explained that this was particularly the case "with companies seeking narrow functionality."[151] It further explained that the acquisition would complement Oracle's current offerings, allow it to provide a two-tier solution, and that the time was right strategically to pursue the transaction.[152]

The Special Committee determined that "acquisition of [NetSuite] could be highly beneficial to [Oracle], that alternatives for participation in this market segment were unattractive or not ready or timely available and that an acquisition of [NetSuite] could fill a strategic gap for [Oracle] that it was

[147] JX947 at 4.
[148] JX952 at 1–2.
[149] JX952 at 2.
[150] JX948 at 4.
[151] JX948 at 6.
[152] JX949 at 2.

important for [Oracle] to address."[153]  Further, the Special Committee believed that it was time to make an offer and tasked Moelis and Oracle management with valuing NetSuite and addressing the "tactical considerations" of an initial offer.[154]  Nonetheless, the Special Committee determined that it would "remain open-minded about potential alternatives if they were to emerge."[155]

On May 23, 2016, representatives of Oracle and Moelis spoke over the phone and discussed a preliminary financial model for NetSuite and the underlying assumptions.[156]  Three days later, on the afternoon of May 26, 2016, Skadden shared rules of recusal, which had been approved by the Special Committee, with Oracle management, who forwarded them to Ellison.[157]  The rules of recusal prohibited Ellison from discussing the Transaction with anyone but the Special Committee, required Oracle employees brought in to assess the Transaction to be made aware of Ellison's recusal, and forbade Oracle officers and other employees from participating in the negotiation process absent Special Committee direction.[158]

---

[153] JX949 at 2.
[154] JX949 at 2.
[155] JX949 at 2.
[156] JX975 at 5.
[157] JX972 at 1.
[158] JX971 at 1.

That same day, Catz had a conversation with Goldberg during which Goldberg expressed a lack of desire to sell NetSuite, but that he understood his fiduciary duties, and that Oracle would need to offer a good price.[159]  Catz reassured him that Oracle intended to run NetSuite independently.[160]  After the call, Goldberg reported the conversation to NetSuite's in-house counsel.[161]

On May 27, 2016, the Special Committee held a meeting with Skadden, Moelis, and Oracle management, including Catz and Kehring, in attendance.[162]  Oracle management and Moelis separately presented their valuations to the Special Committee.[163]  Oracle management prepared an incremental model, discounted cash flow analyses, and multiples based on precedent transactions.[164]  Kehring, with the assistance of Catz and Hurd, set the assumptions underlying these models.[165]  The incremental model projected NetSuite revenues lower than Wall Street's projections of NetSuite as a standalone company and did not include revenue synergies for Oracle.[166]  On the assumption of use of Oracle's infrastructure and resources, NetSuite's

[159] JX988; *see also* Tr. 784:9–786:15.
[160] Tr. 784:9–19, 982:4–10.
[161] JX988; Tr. 785:12–13.
[162] JX979 at 1–2.
[163] PTO § 70.
[164] JX979 at 1; JX980.
[165] Tr. 479:16–480:11.
[166] JX973 at 13; JX1287 at 19; Tr. 550:2–555:1, 1544:12–1546:4, 1548:4–14.

EBIT margins gravitated towards those of Oracle.[167] Oracle's management recommended an opening bid of $100.00 per share.[168] Prior to her exit from the meeting,[169] Catz failed to report her May 26, 2016 conversation with Goldberg to the Special Committee.[170]

Moelis reviewed these models, performed diligence on their assumptions, questioned management about them, and concluded that they were reasonable.[171] Moelis's own presentation, which it gave after management departed the meeting,[172] reported public market price targets, revenue multiples, and precedent transactions.[173]

The Special Committee discussed price and preliminarily settled on an initial offer of $102.00 to $105.00 per share.[174] After discussing the risks associated with an offer lower than that range, and noting management's support of an initial proposal of $100.00 per share, the Special Committee determined that Moelis should communicate an offer of $100.00 per share to

[167] Tr. 560:4–560:15; *see* JX980 at 2.
[168] JX979 at 2.
[169] JX979 at 2.
[170] Tr. 1577:3–5.
[171] Tr. 2389:10–2393:9; 2398:20-2399:15 ("Yeah, we believed them—we certainly took note of them. They were reasonable. From a cost savings perspective, they struck us as reasonable. And then we looked at the revenue scale, interestingly enough, if I remember correctly, it was maybe even conservative.").
[172] JX979 at 2.
[173] JX975; JX979 at 2.
[174] JX979 at 2; Tr. 1163:6–19; 56:15–20, 215:20–216:21.

NetSuite's financial advisor.[175] Moelis communicated the initial proposal on June 1, 2016.[176]

On June 7, 2016, NetSuite responded with a counterproposal of $125.00 per share.[177] The next day, the Special Committee (except for Conrades)[178] held a meeting with Skadden, Moelis, and Oracle management, including Catz and Kehring, in attendance.[179] The Special Committee discussed NetSuite's June 7 counterproposal and decided to raise its offer, via Moelis, to $106.00 per share.[180] The Special Committee's 106.00 per share offer was intended to maintain room to negotiate below a $110.00 ceiling.[181] Both the ceiling and the offer were informed by Oracle management's opinion.[182] Specifically, $110.00 was the limit at which the acquisition would no longer be accretive.[183]

---

[175] JX979 at 2–3 (The Special Committee determined that the Potential Transaction should be subject to i) approval by a fully empowered independent special committee of NetSuite and ii) subject to a non-waivable condition requiring a majority of the minority vote of shares not owned or associated with Ellison and his children); Tr. 1163:15–1165:6, 55:23–57:5, 216:2–217:7.

[176] JX1005 at 1.

[177] PTO ¶ 71.

[178] JX1026 at 1.

[179] JX1026 at 1.

[180] PTO ¶ 72; JX1026 at 1–3.

[181] Tr. 1167:1–1169:8.

[182] Tr. 1167:1–1168:10.

[183] Tr. 1167:11–20 ("Well, you know, we had a—a presentation from management that said, you know, from their perspective and their financial model, that they could support nothing above—in their opinion, nothing above 110. And, you know, Secretary Panetta and Mr. Conrades and I felt

On June 11, 2016, NetSuite countered at $120.00 per share and indicated that it had little room left to negotiate a lower price.[184] On June 14, 2016, the Special Committee held a meeting with Skadden, Moelis, and Oracle management, including Catz and Kehring, in attendance.[185] Catz expressed frustration with the counterproposal because she believed it was not proportional to the Special Committee's move.[186] Kehring noted Microsoft's recent acquisition of LinkedIn and how this expenditure had removed Microsoft from potential competition for NetSuite.[187] Management, including Catz, recommended that the Special Committee decline to counter NetSuite's offer.[188] Then, the members of Oracle management left the meeting, and Moelis stated its agreement that $120.00 per share was unreasonable and that declining to counter would "send a very strong message."[189] After weighing the risks, the Special Committee directed Moelis to inform NetSuite's advisor

---

that the supportability of a deal, you know, has to fit in a P&L. So we were very attentive to this number 110.").

[184] PTO ¶ 73; JX1046 at 1–2.
[185] JX1046 at 1.
[186] JX1046 at 2; Tr. 1471:12–1472:1.
[187] JX1046 at 2.
[188] JX1046 at 2.
[189] JX1046 at 2.

34

that it would not provide a counter-proposal.[190] The Special Committee was prepared to let the deal die.[191]

On June 22, 2016, Catz called Goldberg.[192] Over the course of the 17-minute phone call,[193] Goldberg expressed concern that Ellison was angry with him,[194] in part because Goldberg had not received an invitation to Ellison's cherry blossom party.[195] Catz explained that Ellison was not permitted to have contact with Goldberg.[196]

### c. The Second Round of Offers and Price Agreement

By June 28, 2016, the deal appeared to be dead.[197] In fact, Oracle's chief financial advisor, Stuart Goldstein, was on vacation when he received a call from NetSuite's financial advisor, Qatalyst Partners ("Qatalyst"), indicating an interest in

---

[190] PTO ¶ 74; JX1046 at 2.
[191] Tr. 1173:6–1173:9.
[192] Tr. 1633:18–1635:13.
[193] Tr. 1633:18–1635:13.
[194] Tr. 1636:11–17.
[195] Tr. 1636:18–1637:4, 1649:14–1650:7.
[196] Tr. 1636:18–1637:2.
[197] JX1086. Nonetheless, Proactive Investors published a story entitled "NetSuite advances over takeover rumors", which noted the swirl of continuing rumors about that company and the potential of an Oracle takeover. JX1088:1.

moving the deal forward and stating that NetSuite had more flexibility than previously communicated,[198] given market turmoil surrounding the Brexit vote.[199]

On June 30, 2016, the Special Committee held a meeting with Skadden, Moelis, and Oracle management, including Catz and Kehring, in attendance.[200] Catz did not report her June 22, 2016 call with Goldberg to the Special Committee.[201] Catz and Kehring recommended that the Special Committee organize a diligence session to understand NetSuite's soon-to-be-published Q2 financials.[202] After the members of Oracle management left the meeting, the Special Committee decided to engage in additional diligence, which could inform its decision of whether to re-engage in negotiations.[203] Although there was a risk that the window of opportunity to ink a deal would close, the Special Committee thought that requesting diligence signaled toughness on price and a lack of anxiety to re-start negotiations.[204] "The Special Committee then directed and authorized Moelis to communicate back to

---

[198] Notice of Lodging of Dep. Transcripts and Video Recordings Ex. 13, at 199:1–25, 253:7–14, 273:7–19, Dkt. No. 730; JX1104 at 1–2.
[199] JX1104 at 1–2.
[200] JX1104 at 1.
[201] Tr. 1636:3–8.
[202] JX1104 at 2; Tr. 1174:6–16.
[203] JX1104 at 2.
[204] JX1104 at 2.

Qatalyst that the Special Committee requested a due diligence session with" NetSuite management.[205]

On July 6, 2016, Gill presented NetSuite's Q2 results to Oracle management and James.[206] NetSuite had met its earnings projections; nonetheless, NetSuite's SaaS bookings growth was down.[207]

On July 8, 2016, the Special Committee held a meeting with Skadden, Moelis, and Oracle management, including Catz and Kehring, in attendance.[208] Catz reported on the July 6 diligence call.[209] "The Special Committee discussed with Management and Moelis whether [NetSuite's Q2] results indicated a softening in [NetSuite]'s core business and how these financial results might impact the incremental financial model for the acquisition."[210] After Oracle management left the meeting, the Special Committee determined that from a "tactical and substantive standpoint," the correct course of action was to ask for more information.[211] The

---

[205] JX1104 at 3.
[206] PTO ¶ 77.
[207] JX1138 at 1–2; Tr. 1477:6–15.
[208] JX1138 at 1.
[209] PTO ¶ 78; Tr. 1477:6–1480:8 (Catz relayed that NetSuite had a lumpy and disappointing quarter and that she believed the Special Committee could use it as negotiating leverage).
[210] JX1138 at 2.
[211] JX1138 at 2.

intention was to impress upon NetSuite's transaction committee why Oracle's current offer of $106.00 was reasonable.[212]

On July 11, 2016, NetSuite stock saw unusual options activity, and on July 12, 2016, rumor of the Transaction leaked to the financial press.[213] To reflect NetSuite's Q2 results and the recent diligence, Catz revised Oracle's incremental model for NetSuite downwards.[214] On July 12, 2016, the Special Committee held a meeting with Skadden, Moelis, and Oracle management, including Catz and Kehring, in attendance.[215] During that meeting, Oracle management reviewed the additional diligence, presented its revised model, and answered questions before leaving.[216] The Special Committee authorized Moelis to convey to NetSuite that the Special Committee's prior offer of $106.00 was still available but that it was not raising its offer at that time.[217] After the Special Committee meeting, NetSuite countered the Special Committee's non-bid by offering to accept $111.00 per share, down substantially from its last offer of $120.[218]

---

[212] *See* JX1138 at 2.
[213] JX1176.
[214] JX1183 at 7–8; Tr. 1481:2–1482:1.
[215] PTO ¶ 79; JX1186 at 1.
[216] JX1186 at 1–2; Tr 1481:2–1482:9.
[217] JX1186 at 2; Tr. 1183:1–7.
[218] PTO ¶ 80.

On July 13, 2016, the Special Committee held a meeting with Skadden, Moelis, and Oracle management, including Catz and Kehring, in attendance.[219] Oracle management presented revised incremental models reflecting conservative, base, and upside results.[220] The conservative model matched the revised model that was presented to the Special Committee on July 12, 2016, and the base case matched the original model that was before the Special Committee.[221] Catz reverted to the use of the un-revised base case after reflection on questioning from the Special Committee.[222] Specifically, Panetta noted the regularity of lumpiness within NetSuite bookings growth and questioned if a downwards revision was truly warranted.[223] Catz acknowledged she made an analytical mistake in shifting from the original model.[224]

The Special Committee discussed the three models with Oracle management as well as next steps.[225] When asked how to counter NetSuite's $111.00 offer, Catz recommended that the Special Committee offer $108.50 to split the difference.[226] Oracle management left the meeting, and the Special Committee discussed how to

---

[219] PTO ¶ 81; JX1206 at 1.
[220] JX1206 at 2; JX1204 at 2–5.
[221] *See* JX1204 at 2–4; JX1183 at 7-8; JX1215.
[222] Tr. 1484:22–1485:22.
[223] Tr. 1484:22–1485:15.
[224] Tr. 1484:22–1485:22; JX1215.
[225] JX1206 at 2.
[226] Tr. 1186:19–21, 1488:15–24.

proceed with Moelis.[227]  Moelis recommended communicating a "best and final" offer and the Special Committee agreed.[228]  The members of the Special Committee felt that deal dynamics favored an offer at a full dollar increment and directed Moelis to convey a best and final offer of $109.00 to NetSuite.[229]  That same day, July 13, 2016, NetSuite accepted the $109.00 per share offer.[230]  The Special Committee paid a dollar less than their ceiling.

### d. Price Agreement to Closing

On July 15, 2016, Oracle and NetSuite "'entered into an exclusive period of diligence.'"[231]  Oracle management, Moelis, and Skadden held a diligence meeting on July 17, 2016.[232]  Following this meeting, on the week of July 18, 2016, members of Oracle management held additional diligence meetings.[233]  On July 25, 2016, the Special Committee held a meeting with Skadden and Moelis in attendance.[234] Moelis presented its valuation analyses to the Special Committee.[235]  Moelis noted

---

[227] JX1206 at 2.
[228] JX1206 at 2.
[229] PTO ¶ 81; JX1206 at 2; Tr. 1186:22–1189:3, 2454:16–2455:15.
[230] PTO ¶ 82.
[231] PTO ¶ 83.
[232] PTO ¶ 84.
[233] PTO ¶ 84.
[234] JX1291 at 1.
[235] PTO ¶ 85.

that Oracle management's conservative case for projected revenue was below those Wall Street analysts while the base case and upside case straddled NetSuite's projections.[236] Although it used the incremental models' projections, Moelis performed its own DCF analyses.[237] Moelis similarly created its own list of comparable companies and transactions.[238] Overall, Moelis reported that it was prepared to provide a written fairness opinion stating that $109.00 per share was fair to Oracle stockholders from a financial point of view.[239]

Two days later, on July 27, 2016, the Special Committee held a meeting with Skadden, Moelis, and Oracle management, including Catz and Kehring, in attendance.[240] Oracle management updated the Special Committee on its "bring-down" diligence and presented a financial model.[241] Oracle management confirmed that NetSuite and Fusion would "coexist in the marketplace" and that its diligence provided confidence in the incremental model.[242] After Oracle management left the meeting,[243] Moelis presented an oral version of its fairness opinion and confirmed

[236] Tr. 2460:21–2463:2; *see* JX1287 at 19.

[237] Tr. 2466:23–2468:12, 2396:23–2400:16; JX1287 at 27–29.

[238] Tr. 2463:8–2466:19, 2468:7–2468:12; JX1291 at 2; JX1287 at 25–26.

[239] PTO ¶ 85. Moelis's engagement letter entitled it "to assume that financial forecasts and projections [Oracle], the [Special Committee] or [NetSuite made] available to [it were] reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of [Oracle] or [NetSuite]." JX912 at 3.

[240] PTO ¶ 86; JX1329 at 1.

[241] PTO ¶ 86.

[242] JX1306 at 2, 5, 15; JX1329 at 1–2; Tr. 1497:19–1498:4, 1511:1–12.

[243] JX1329 at 2.

that it would provide a written fairness opinion that $109.00 per share was fair to Oracle's stockholders.[244]  The Special Committee approved the Agreement and Plan of Merger between Oracle and NetSuite (the "Merger Agreement"), subject to receiving a formal fairness opinion from Moelis.[245]  Oracle and NetSuite executed and announced the Merger Agreement on July 28, 2016.[246]  Following the signing of the Merger Agreement, Catz was quoted as saying "'We expect this acquisition to be immediately accretive to Oracle's earnings on a non-GAAP basis in the first full fiscal year after closing.'"[247]  Moelis delivered its formal fairness opinion on July 29, 2016.[248]

### e. The Tender Offer

The Merger Agreement structured the deal as a tender offer, requiring a majority of NetSuite shares not affiliated with Ellison, NetSuite's officers, or NetSuite's directors to tender in support of the transaction.[249]  Absent an extension, if the requisite number of shares were not tendered by September 15, 2016, the

---

[244] PTO ¶ 86.
[245] PTO ¶ 86.
[246] PTO ¶ 89; JX1405.
[247] Jx1405 at 1.
[248] PTO ¶ 86.
[249] JX1405 at 1.

42

transaction would fail.[250]   Additionally, the transaction was conditioned on the Department of Justice's antitrust approval.[251]   The Department of Justice completed its review quickly and approved the transaction on September 26, 2016.[252]

T. Rowe Price ("TRP") was NetSuite's largest stockholder other than Ellison.[253]   In a letter dated September 6, 2016, TRP indicated to the NetSuite transaction committee that it would refuse to tender its shares at $109.00 per share.[254] It provided a number of reasons why NetSuite's negotiation was deficient: among these was mention of Catz's January 19, 2016 dinner with Nelson, which it described as a "loose, pre-due-diligence, exploratory conversation where a price range of $100-125 was discussed."[255]   TRP believed this discussion anchored the price too low.[256]

On September 9, 2016, the Special Committee extended the deadline to tender shares to October 6, 2016 in order to facilitate the completion of the Department of Justice's antitrust review.[257]   TRP and another large stockholder, who together

---

[250] JX51497 at 5; JX1498 at 9.
[251] PTO ¶ 93.
[252] PTO ¶ 95; JX1636.
[253] JX1555 at 3.
[254] JX1555 at 3, 5.
[255] JX1555 at 4; Nelson made TRP aware of the conversation with Catz at an August 30, 2016, meeting between NetSuite management and directors and TRP.  JX1555 at 3.
[256] JX1555 at 4.
[257] PTO ¶ 94; JX1571 at 1.

owned approximately 45.5% of NetSuite's outstanding, unaffiliated shares, had not tendered by October 4, 2016.[258] The Special Committee held a meeting with Skadden and Oracle management, including Catz and Kehring, in attendance.[259] Management recommended extending the deadline to tender shares but not raising Oracle's offer.[260] After Oracle management left the meeting, the Special Committee determined that it would extend the deadline one final time to November 4, 2016, and would not raise Oracle's offer.[261]

As they had done previously,[262] Oracle management continued to publicly state that $109.00 was Oracle's "best and final" offer.[263] On October 27, 2016, TRP sent a letter to the Special Committee stating that it would tender its shares if Oracle increased its offer to $133.00 per share.[264] TRP reasoned that its valuation was consistent with the valuations of the financial advisors consulted by Oracle and NetSuite.[265] The Special Committee reviewed the letter, determined that $109.00 was the price,[266] and responded by publicly filing TRP's letter with a statement that

---

[258] JX1649 at 1.
[259] JX1649 at 1.
[260] JX1649 at 1; Tr. 2478:6–17 (Oracle's banker noted, "I'll quote. Safra Catz, quote, unquote, we are not going to pay a single penny more.").
[261] PTO ¶ 96; JX1649 at 2; JX1658 at 1.
[262] JX1601.
[263] JX1733 at 1.
[264] JX1753 at 3.
[265] JX1753 at 3.
[266] JX2727.

insufficient tender by NetSuite's unaffiliated stockholders for $109.00 per share will terminate the deal.[267]

The Special Committee held a meeting on November 4, 2016, with, Moelis, and Oracle management, including Catz and Kehring, in attendance.[268] The Special Committee met to consider the potential outcomes of the tender offer, which was due to expire later that evening.[269] Ultimately, the tender offer period expired on November 4, 2016, with 53.2% of NetSuite's unaffiliated shares tendered, and the acquisition closed on November 7, 2016.[270]

## B. Procedural History

This is my seventh memorandum opinion in this action, which was initiated more than six years ago, on May 3, 2017.[271] Since filing, it has taken a somewhat circuitous and procedurally complex path to trial. I outline that path below.

---

[267] JX1762 at 3.
[268] JX1792 at 1.
[269] JX1792 at 1–2.
[270] PTO ¶¶ 97–98.
[271] PTO ¶ 4; *See In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331 (Del. Ch. Mar. 19, 2018); *In re Oracle Corp. Deriv. Litig.*, 2019 WL 6522297 (Del. Ch. Dec. 4, 2019); *In re Oracle Corp. Deriv. Litig.*, 2020 WL 3410745 (Del. Ch. June 22, 2020); *In re Oracle Corp. Deriv. Litig.*, 2020 WL 3867407 (Del. Ch. July 9, 2020); *In re Oracle Corp. Deriv. Litig.*, 2021 WL 2530961 (Del. Ch. June 21, 2021); *In re Oracle Corp. Derivative Litig.*, 2022 WL 3136601 (Del. Ch. May 20, 2022).

The initial complaint was filed on May 3, 2017, and a separate action was filed was filed on July 18, 2017, following a books and records inspection.[272]  The two actions were consolidated under the caption *In re Oracle Corporation Derivative Litigation*, C.A. No. 2017-0337-JTL.[273]  Vice Chancellor Laster appointed Firemen's Retirement System of St. Louis ("Firemen's") as the lead plaintiff for the consolidated action.[274]

On January 11, 2018, the case was reassigned to me.[275]  On March 19, 2018, following briefing and oral argument, I denied Ellison's and Catz's motions to dismiss under Court of Chancery Rules 23.1 and 12(b)(6),[276] concluding that the Plaintiffs had adequately alleged facts that made it reasonably conceivable that a majority of the Oracle board lacked independence from Ellison[277] and that Ellison and Catz had acted disloyally with respect to the Transaction.[278]  Plaintiffs voluntarily dismissed former Defendants Hurd, Jeffrey Henley, Michael Boskin, Jeffrey Berg, Hector Garcia-Molina, Naomi Seligman, Conrades, Bruce Chizen, Panetta, James, and H. Raymond Bingham without prejudice on March 28, 2018.[279]

---

[272] PTO ¶¶ 4–5.
[273] PTO ¶ 6.
[274] PTO ¶ 7.
[275] Case Reassignment Letter, Dkt. No. 65.
[276] PTO ¶ 8.
[277] *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331, at *20 (Del. Ch. Mar. 19, 2018).
[278] *Id.*
[279] PTO ¶ 9.

On May 4, 2018, Oracle's board of directors formed a special litigation committee to investigate the claims asserted in this action (the "SLC").[280] I stayed the action pending that committee's investigation.[281] In February of 2019, I lifted the stay to allow the SLC to seek non-party discovery from TRP.[282] I similarly lifted the stay in July 2019 to allow Plaintiffs to file an amended complaint, which reasserted claims against the voluntarily-dismissed Oracle directors and officers and asserted new claims against Goldberg and Nelson.[283]

In a move that could fairly be called "surprising," the SLC declined either to take over this derivative litigation or to dismiss it.[284] The case was returned to the Plaintiffs because there were risks to both plaintiff and defendants stemming from the likelihood that the question of the standard of review would not be resolved until trial.[285] This proved prescient.

From late August to mid-September 2019, Defendants fired a salvo of motions to dismiss.[286] On November 27, 2019, Firemen's filed its Verified Second Amended

---

[280] PTO ¶ 10.
[281] PTO ¶ 11.
[282] PTO ¶ 13.
[283] PTO ¶ 15.
[284] PTO ¶ 16; *see In re Oracle Corp. Derivative Litig.*, 2019 WL 6522297, at *1, 17 n.246 (Del. Ch. Dec. 4, 2019).
[285] PTO ¶ 16.
[286] PTO ¶¶ 17–19.

47

Derivative Complaint.[287]  Henley, Conrades, James, Panetta, Boskin, Berg, Garcia-Molina, Seligman, Chizen, Bingham, and Paula R. Hurd as Trustee of the Hurd Family Trust moved to dismiss the second amended complaint on December 13, 2019.[288]  Upon stipulation by the parties, I dismissed Boskin, Berg, Garcia-Molina, Seligman, Conrades, Chizen, Bingham, and Panetta with prejudice.[289]

Plaintiffs filed their third amended complaint on February 18, 2020, which removed claims against the proximately dismissed defendants.[290]  On February 20, 2020, Henley, James, and Paula R. Hurd as Trustee of the Hurd Family Trust filed a motion to dismiss the third amended complaint.[291]

On April 29, 2020, I granted Plaintiff Robert Jessup's motion to intervene.[292]  Ellison and Catz filed a motion for summary judgment against Firemen's for lack of standing.[293]  In July, following briefing and oral argument, I held that motion in abeyance and granted an order appointing Jessup as co-lead Plaintiff.[294]

---

[287] PTO ¶ 20.
[288] PTO ¶ 21.
[289] PTO ¶ 22.
[290] PTO ¶ 23.
[291] PTO ¶ 24.
[292] PTO ¶ 25.
[293] PTO ¶ 26.
[294] PTO ¶¶ 28–29.

On October 22, 2022, the Plaintiffs requested, and I granted, leave to file a fourth amended derivative complaint.[295] This complaint removed claims against Nelson and Goldberg, who were previously successful in their motions to dismiss Count II of the Verified Third Amended Derivative Complaint.[296] On December 11, 2020, Plaintiffs again requested, and I granted, leave to file an amended complaint.[297] Plaintiffs' filed their Verified Fifth Amended Derivative Complaint that same day.[298] On June 21, 2021, following briefing and oral argument, I denied James' motion to dismiss, but granted the motions to dismiss of Henley and Paula R. Hurd (as Trustee of the Hurd Family Trust).[299]

The Parties took discovery, exchanged expert reports, and took depositions between February 2019 and December 2021.[300] James moved for summary judgment on December 23, 2021.[301] Following briefing and oral argument, I granted James' motion for summary judgment as to the allegation that James acted in bad faith, but denied the motion as to the allegation that she breached her duty of loyalty by acting to advance the self-interest of an interested party—Ellison—from whom

---

[295] PTO ¶ 30.
[296] PTO ¶¶ 27, 30.
[297] PTO ¶ 31.
[298] PTO ¶ 31.
[299] PTO ¶ 32.
[300] PTO ¶¶ 33–35.
[301] PTO ¶ 36.

49

she could not be presumed to act independently, finding that pertinent factual issues remained for trial.[302]

On July 6, 2022, the parties filed their pre-trial briefs.[303] A ten day Trial was scheduled for July 18 to July 29, 2022.[304] The first five days, July 18 to July 22 were held in person.[305] An outbreak of Covid forced the trial to move to a hybrid format for July 25.[306] The Parties used July 26 to work out the logistics for moving the remainder of the trial to Zoom.[307] The last three regularly scheduled days, July 27 to July 29, took place over Zoom,[308] and I held the final day of trial over Zoom on August 16, 2022.[309] The Parties completed post-trial briefing on November 1, 2022.[310] I held post-trial oral argument in Dover on November 18, 2022.[311] The Parties stipulated to the dismissal with prejudice of James on December 22, 2022,

---

[302] PTO ¶ 36.
[303] PTO ¶ 37.
[304] PTO ¶ 39.
[305] Tr. 1:1–3:12, 312:1–314:12, 632:1– 634:12, 958:1–960:12, 1202:1–1204:12.
[306] Tr. 1492:1–1495:18.
[307] Tr. 1752:2–1753:13.
[308] Tr. 1756:1–1758:12, 2038:1–2040:12, 2328:1–2330:15.
[309] Tr. 2636:1–2638:15.
[310] *See* Answering Post-Trial Br. Defs. Safra A. Catz and Lawrence J. Ellison, Dkt. No. 814.
[311] *See* Tr. Post-Trial Oral Arg., Dkt. No. 823.

and I granted that order on December 27, 2022.[312]  I consider the matter fully submitted as of December 27, 2022.[313]

## II. ANALYSIS

### A. *Legal Standard*

Plaintiffs seek to prove a derivative[314] overpayment claim.  Plaintiffs theorize that Ellison, who had a financial incentive to prefer the interests of NetSuite over Oracle, and Catz, seeking to advance Ellison's interests, manipulated the Oracle Special Committee to overpay for NetSuite.[315]  Specifically, per Plaintiffs, "'Ellison wanted Oracle to buy NetSuite before industry participants and market analysts realized what Ellison already knew: [That] NetSuite's business strategy of moving up-market was doomed in light of Oracle's rollout of . . . Fusion.'"[316]  Further, the Plaintiffs argued that Ellison and Catz "caused . . . Oracle to pay more for NetSuite because they were paying for part of NetSuite's business that Oracle did not need,

---

[312] *See* Stipulation and [Proposed] Order of Voluntary Dismissal with Prejudice of Renee J. James, Dkt. No. 825; Order of Voluntary Dismissal with Prejudice of Renee J. James, Dkt. No. 826.
[313] Unfortunately, circumstances beyond my control delayed my consideration of the matter and the issuance of this post-trial opinion.
[314] That is, the claim was originally derivative.  It is being pursued now with the consent of the Special Litigation Committee.
[315] Tr. 42:21–43:17.
[316] Tr. 43:7–15.

51

did not want, and . . . was of little or no value because Oracle was already poised to dominate that part of the" market.[317]   Finally, the Plaintiffs contend that "immediately after acquisition, and" on a continuing basis, "the company that Oracle has in NetSuite and is using in NetSuite isn't as valuable as the company that" Ellison, Catz, and Oracle management "presented to . . . the [S]pecial [C]ommittee, in order to cause" it to move forward with that transaction.[318]

"Delaware's default standard of review is the business judgment rule."[319] Absent a showing by the Plaintiff that the business judgment rule has been rebutted, that rule will serve as the lens of review.[320]

To bring the transaction within the exacting standard of entire fairness, Plaintiffs proffer two theories.  First, the Plaintiffs argue that Ellison was a controller who sat on both sides of the transaction.[321]  Second, the Plaintiffs contend that Ellison, on his own and through Catz, misled the Oracle board and the Special Committee, thereby rendering the transaction a product of fraud.[322]

These theories are addressed, below.

---

[317] Tr. 44:8–17.
[318] Tr. 45:1–8.
[319] *In re Columbia Pipeline Grp., Inc.*, 2021 WL 772562, at *30 (Del. Ch. Mar. 1, 2021).
[320] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995).
[321] Pls.' Corrected Opening Post-Trial Br. 88, Dkt. No. 795.
[322] *Id.*

### 1. Ellison Was a Conflicted Director

Delaware's default standard of review is business judgment.[323] That standard is inapplicable, however, "[w]here at least half of the directors who approved the transaction were not disinterested or independent."[324]

Here Ellison, an Oracle director and officer, received a benefit from the sale of his stock in NetSuite that Oracle's other stockholders did not receive.[325] Appropriately, Ellison insulated himself from the board's discussion of NetSuite acquisition, throughout the process. Moreover, in light of Ellison's conflict of interest, Oracle's board formed a Special Committee with the power to assess alternatives, negotiate the Transaction, and approve or reject the Transaction.[326] The Special Committee was composed of three members. The Plaintiffs did not contend at trial that two members, Conrades and Panetta, were dependent on Ellison or interested in the transaction, or otherwise conflicted. The evidence at trial proved that the third member, James, was likewise unconflicted, and Plaintiffs, post trial, dismissed claims against James as well.[327] In other words, Plaintiffs abandoned their

---

[323] *Columbia Pipeline*, 2021 WL 772562, at *30.

[324] *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 990 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).

[325] *See* PTO ¶¶ 44–48, 98 (noting Ellison's holdings in both companies).

[326] JX759 at 2–5.

[327] Order of Voluntary Dismissal with Prejudice of Renee J. James, Dkt. No. 826; Order of Dismissal as to Certain Defs., Dkt. No. 304.

theory at trial, which was that James had ambitions to be a CEO in the tech industry, an ambition for which she was reliant on Ellison; Plaintiffs' theory was that she accordingly skewed the transaction in his favor, and breached her own duty of loyalty to Oracle. The evidence at trial did not support this theory.[328] I find by the preponderance of the evidence that James, like her fellow committee members, was independent of Ellison.

The appropriate standard of review is business judgment, unless the Plaintiffs have proven either of their theories; that Ellison was a controller with respect to the transaction,[329] or that he and Catz defrauded the Board.

### 2. Was Ellison a Controller?

An individual (or entity) holding more than 50% of the voting power of a corporation is in hard control of the entity, because of her ability to remove, and thus

---

[328] This theory, strongly disproved, in my view, by the trial evidence, had some odor of denigrating the abilities of women executives to succeed based on their merits.

[329] Because I find Ellison was not a controller, I need not address whether his recusal, and the establishment by the remainder of the Board of an independent and fully-functioning special committee, would be sufficient under the facts here to cleanse a controller conflict.

influence, the directors.[330]  Ellison, however, held less than 30 % of the voting power in Oracle, and did not enjoy hard control.[331]

> [A] shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status. For a dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of corporation conduct.[332]

Of course, more than mere allegation is required post-trial.  A plaintiff must show that the alleged controlling stockholder *in actuality* dominated the corporate conduct, either generally or with respect to the transaction in question, to hold the stockholder to duties as a fiduciary.

Did Ellison control the operation of Oracle at the time of the transaction, thus usurping the power of the directors and imposing upon himself fiduciary duties?  I find from the evidence that he did not.

"The inquiry of actual control seeks to answer whether, 'as a practical matter, [the alleged controller was] no differently situated than if it had majority voting

---

[330] *See Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994).
[331] PTO ¶¶ 45–46.
[332] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994) (quoting *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989)).

control.'"[333]  The Delaware Supreme Court has identified various potential indicia of "general control," including the ability to:

> (a) elect directors; (b) cause a break-up of the corporation; (c) merge it with another company; (d) cash-out the public stockholders; (e) amend the certificate of incorporation; (f) sell all or substantially all of the corporate assets; or (g) otherwise alter materially the nature of the corporation and the public stockholders' interests.[334]

Bearing these and other indicia of control in mind, for an individual or entity to exercise general control over the corporate machinery, the power of the putative controller must be such that independent directors "'cannot freely exercise their judgment'" for fear of retribution.[335]

In post-trial briefing, Plaintiffs highlighted Ellison's status as Oracle's founder and "visionary leader,"[336] his control over Oracle's product direction,[337] and his Oracle stock ownership, which "dwarf[ed] the ownership of the board as a whole or any institutional investor."[338]  Further, Plaintiffs noted that, "in light of Oracle's director majority voting policy," Ellison's voting block "was indispensable to re-

---

[333] *In re GGP, Inc. Stockholder Litig.*, 2021 WL 2102326, at *20 (Del. Ch. May 25, 2021), *aff'd in part, rev'd in part and remanded*, 282 A.3d 37 (Del. 2022), *reargument denied* (Aug. 10, 2022) (quoting *In re PNB Holding Co. Shareholders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)).

[334] *Id.* (quoting *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1994)).

[335] *In re Morton's Rest. Grp., Inc. Shareholders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (quoting *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del.Ch. Aug. 18, 2006)).

[336] Pls.' Corrected Opening Post-Trial Br. 83, 100, Dkt. No. 795.

[337] *Id.* at 100.

[338] *Id.* at 99–100.

electing incumbent outside directors,"[339] providing, as one example, the 2013 re-election of Cizen, Conrades, and Seligman in which Ellison's votes were purportedly indispensable.[340]

The evidence presented at trial demonstrated that the Oracle board vigorously debated assumptions and was not afraid to stand opposed to Ellison.[341] For example, in one instance, the board forced Ellison to fire a senior member of his team over his strong objection.[342] In light of that evidence, I find Ellison had clout, but did not exercise general control. The same can be said of Ellison's relationship with Catz and Hurd, Oracle's co-CEOs. For example, when Catz determined that it was not in Oracle's best interest to pursue multi-cloud with Microsoft and shut the project down, it took Ellison in his capacity as CTO a year to convince her to change her mind.[343] In both relationships, senior management gave Ellison's ideas a respectful hearing but did not appear cowed or overawed by him. In 2016, the executive function of Oracle resided in its dual CEOs, Catz and Hurd. While Ellison remained a potent force in Oracle, his role at the time of the merger was Chief Technology

---

[339] *Id.* at 100.
[340] *Id.*
[341] Tr. 197:9–198:4 ("Debating assumptions is a characteristic of Oracle meetings."), 27:18–28:15 (noting that there were times that Ellison was in favor of an idea and after raising it with the board it was not pursued).
[342] Tr. 1871:7–1872:1.
[343] Tr. 1865:18–1866:20.

Officer. The record does not show that he controlled the day-to-day function of Oracle, or dictated the operation of the company to the Board. I cannot find actual control of the Company from the evidence presented at trial.

I do find it, however, more likely than not that the Ellison could have exerted control as to particular transactions, if he had so desired. Ellison was so closely identified with Oracle that an insistence on a particular policy or result had the potential to sway the business judgment of the directors and the executives of Oracle. At trial and in briefing, the Plaintiffs highlighted instances where Catz referred to Ellison as her boss[344] or Oracle's "visionary leader."[345] For example, Plaintiffs excerpted from a 2019 public interview where Catz said:

> It's a team effort. It's a team sport. You have to have a leader. Larry Ellison is it. Don't let titles fool you. I am – I am very, very helpful, as is Mark Hurd, who is my co-CEO. We are good executors, good editors on his vision, but like many of you who are also founders and CEOs and chairmen, you're guiding lights of your company, and there's no substitute for what you do. None. It is, though, quite helpful to have others on the team who share your vision. Who are focused on executing your vision. Who have no individual alternative agenda. The one thing Larry can count on, in my case, I am now finishing my 20[th] year at Oracle, and I'm one of the new kids, and – is he never has to worry that I've got an agenda any different than to make – to make Oracle successful and to make his vision come true.[346]

---

[344] Pls.' Corrected Opening Post-Trial Br. 5, 85 n.473, Dkt. No. 795.
[345] *Id.* at 100 (citing Tr. 1701).
[346] Tr. 1702:1–17; JX2856.

58

Did Ellison attempt to wield this potential control in regard to the NetSuite acquisition? The evidence demonstrates that he did not.

The timeline of the transaction is instructive. Oracle historically had an aggressive policy of growth by acquisition.[347] Prior to the annual offsite meeting at Porcupine Creek on January 14–15, 2016, Hurd and Catz discussed the acquisition of NetSuite with Ellison.[348] Ellison's lack of opposition was necessary to any transaction due to his ownership position in NetSuite.[349] Ellison did not oppose an acquisition.[350] Accordingly, Catz put the purchase of NetSuite as one of several potential acquisitions to be discussed with the board.[351] At the meeting with the board, when a NetSuite deal was broached, Ellison left the meeting.[352] Oracle's directors agreed to consider an acquisition.[353] Catz and Hurd were authorized by the directors (without Ellison) to approach NetSuite to see if it was open to a discussion of a merger, but the Oracle executives were instructed not to discuss price terms.[354]

---

[347] Tr. 530:5–531:24; JX2469 at 8; JX391 at 11.
[348] Tr. 1981:16–1982:11; *see also* Tr. 1661:23–1662:21 ("Larry did not say let's not do it. He said he wouldn't object to it. And he left, and then it just left me, unfortunately, just left me and Mark to argue it out and talk with our board in January").
[349] *See* PTO ¶¶ 47–48 (providing Ellison's stake in NetSuite).
[350] Tr. 1661:23–1662:21, 1665:17–1666:21.
[351] *See* Tr. 1415:16–21 ("It only made sense to do it last, because then we could have Larry in for all the other conversations, and then when this one came up, he could go out.").
[352] Tr. 1415:9–24, 1136:2–9, 40:4–23.
[353] JX624 at 6.
[354] JX624 at 6.

Once Catz reported that NetSuite might entertain a deal,[355] the Board (again without Ellison) created a Special Committee, fully empowered to negotiate an acquisition and consider alternatives, including not buying NetSuite.[356] Thereafter, Ellison scrupulously avoided any discussion of the transaction with the Special Committee.[357] I find, accordingly, that Ellison, although he had the potential to influence the transaction, did not attempt to do so, and that the Special Committee completed the transaction unmolested by his influence.

This is evidenced not only by the lack of contact between Ellison and the Special Committee; it is also clear from examination of the Special Committee's negotiations. Prior to making an offer, the Special Committee investigated alternatives to and the prudence of the acquisition itself.[358] In its initial offer of $100.00 per share, the Special Committee weighed the risks of posing an offer below the range of $102.00 to 105.00 per share, the range it initially settled upon.[359] Following NetSuite's disappointing June 11, 2016 offer, the Special Committee

---

[355] JX759 at 1.

[356] JX759 at 2–5.

[357] Tr. 1828:23–1829:23; *see also* JX624 at 6 (noting Ellison's intent to recuse given his ownership interest in NetSuite).

[358] JX949 at 2.

[359] JX979 at 2–3 (The Special Committee also determined that the transaction, if any, should be subject to i) approval by a fully empowered independent special committee of NetSuite and ii) subject to a non-waivable condition requiring a majority of the minority vote of NetSuite shares not owned by, or associated with, Ellison and his children); Tr. 1163:15–1165:6, 55:23–57:5, 216:2–217:7.

declined to counter.[360]  In the intervening period between June 11, 2016 and June 28, 2016, the deal appeared to be dead.[361]  On the resumption of negotiations, the Special Committee held fast to its non-offer and sought diligence to understand and strengthen its negotiating position despite the risk such delay posed to the potential deal.[362]  The Special Committee maintained this tack in its request for further diligence on July 8, 2016,[363] and ultimately reaffirmed its non-bid on July 12, 2016.[364]  NetSuite bid against itself on July 12, 2016, a month after Oracle had declined to counter-offer.[365]  The Special Committee ultimately negotiated a deal at $109.00 per share, which was a dollar less than its price ceiling.[366]

Moreover, when the requisite approval from the NetSuite minority appeared not to be forthcoming, the Special Committee was prepared to let the deal die rather than increase Oracle's offer.[367]

The record, in other words, demonstrates that the Special Committee, aided by its advisors, negotiated in a hard-nosed fashion that reduced the deal price in a

---

[360] PTO ¶ 74; JX1046 at 2.
[361] JX1086.
[362] JX1104 at 2.
[363] JX1138 at 2.
[364] JX1186 at 2; Tr. 1183:1–7.
[365] PTO ¶ 80.
[366] PTO ¶ 82; Tr. 1167:1–1169:8.
[367] JX1649 at 2; JX1658 at 1.

way that—given Ellison's greater interest in the target than in Oracle—was against Ellison's interest.

Plaintiffs, however, maintain that Ellison nonetheless wielded actual control of the transaction. Their theory primarily rests on Ellison's publicly held view that a transaction with NetSuite, eventually, would make sense, as well as Ellison's January 27, 2016 phone call with Goldberg, and Catz's loyalty to Ellison, which, per Plaintiffs, allowed him to control the transaction through her.[368] I address these in turn, below.

### i. Ellison Did Not Propose the Transaction

Based upon the evidence at trial, the Plaintiffs contend that Ellison raised the concept of buying NetSuite.[369] As noted, Ellison had been a longtime, vocal proponent of a merger with NetSuite.[370] However, in early 2015, Ellison, Catz, and Hurd debated whether to purchase NetSuite, and Ellison, at that time, was the driving force *against* the transaction, which he felt would be confusing to the marketplace, and overpriced.[371] In early 2016, NetSuite was one of the companies that Kehring

---

[368] Pls.' Corrected Opening Post-Trial Br. 101–102, Dkt. No. 795.
[369] *Id.* at 101; Pls.' Answering Post-Trial Br. in Response to the Opening Post-Trial Br. of Defs. Safra A. Catz and Lawrence J. Ellison 7–8, Dkt. No. 813.
[370] Tr. 1664:7–23, 1980:4–1981:22.
[371] Tr. 1962:8–19, 1407:9–1408:5.

62

regularly monitored as a potential takeover target, and corporate development again raised the idea of purchasing NetSuite.[372]

In the weeks preceding the 2016 Oracle board's offsite meeting at Porcupine Creek, Catz and Ellison had a series of private conversations around purchasing NetSuite.[373] Ellison's prior worries about the purchase had been assuaged.[374] First, given the then-recent downturn of cloud stocks, NetSuite was effectively on sale.[375] Second, Fusion was now mature enough that the purchase would not cause disproportionate marketplace confusion.[376] Ellison told Catz that he would not oppose the Transaction.[377] Ellison's agreement with the concept of the Transaction, under these facts, does not show actual control.[378]

Plaintiffs also attempted to demonstrate that Ellison was the driving force behind the Transaction because at Oracle's annual offsite board meeting at

---

[372] Tr. 1408:11–21, 462:8–463:4.
[373] Tr. 1966:10–1972:14.
[374] Tr. 1972:4–10.
[375] Tr. 1967:9–1971:2, 587:15–588:24, 1410:3–21; JX716 at 1, 6.
[376] Tr. 1967:9–1971:2.
[377] Tr. 1972:4–10, 1662:5–21, 1665:17–1666:21.
[378] *See In re Rouse Properties, Inc.*, 2018 WL 1226015, at *20 (Del. Ch. Mar. 9, 2018) (discussing *Morton's Rest. Grp.*, 74 A.3d at 662) (noting that initiation of the transaction in question, when coupled with other factors, was not enough to confer actual control); *see also Kahn v. Tremont Corp.*, 694 A.2d 422, 431 (Del. 1997) ("Initiation[,] . . . standing alone, is not incompatible with the concept of fair dealing so long as the controlling shareholder does not gain financial advantage at the expense of the controlled company"). Further, the Plaintiffs' contentions that Ellison directed the timing of the transaction to overcome familial financial needs were decidedly unconvincing, and I find by a preponderance of the evidence that neither Ellison or his son were in need of a cash infusion sufficient to motivate an action by Ellison against Oracle's interests.

Porcupine Creek, he spoke to the board on "'the benefits, challenges, and opportunities associated with the continued evolution of [Oracle's] suite of cloud products' immediately before Kehring's discussion of . . . NetSuite."[379]  They contend that the presentation "ensured [a] lack of 'resistance or second thoughts from other fiduciaries.'"[380]  This theory borders, to my mind, the metaphysical. Ellison's presentation on Oracle's move to the cloud did not numb the minds or overcome the business judgment of the other directors.[381]  The move to the cloud had been a decade-long undertaking and one that the board rightfully should have been regularly updated on.  Thus, these presentations were within the ordinary course of business.  Although necessary to the board's determination of whether to investigate the potential transaction, these presentations, I find, are manifestly insufficient to show that Ellison drove Oracle's board in any particular direction or trampled over the "resistance or second thoughts [of] other fiduciaries."[382]  It does

---

[379] Pls.' Corrected Opening Post-Trial Br. 101, Dkt. No. 795 (citing JX624 at 5).

[380] *Id.* (quoting *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *28 (Del. Ch. July 6, 2018)).

[381] *See Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *28 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) ("Probative evidence can include statements by participants or other contemporaneous evidence indicating that a defendant was in fact exercising control over a decision.  A court also can consider whether the defendant insisted on a particular course of action, whether there were indications of resistance or second thoughts from other fiduciaries, and whether the defendant's efforts to get its way extended beyond ordinary advocacy to encompass aggressive, threatening, disruptive, or punitive behavior.").

[382] *Id.*

not show any control over the Special Committee, who independently investigated both the prudence and price of the NetSuite merger.

### ii. Ellison Did Not Control the Transaction Through His January 27 Call with Goldberg

Plaintiffs also contend that Ellison indirectly controlled merger negotiations through his control over principals of NetSuite. Although Ellison recused himself on both sides of the transaction,[383] the Plaintiffs' argument is essentially that Ellison's NetSuite holdings were coercive such that Goldberg felt an obligation to sell. Perhaps this argument would make sense if the Plaintiffs represented *NetSuite* stockholders and believed the transaction to have garnered too *low* a price, but that theory does not translate well to the buy side. Obviously, Ellison was conflicted, and, at least, an influential blockholder of NetSuite. This evidence fails to show that Ellison controlled *Oracle* with respect to the transaction.

For similar reasons, Plaintiffs focus on a January 27, 2016 call between Ellison and Goldberg, but this call does not demonstrate Ellison's control over the merger negotiations on behalf of Oracle. After Catz and Nelson had dinner to

---

[383] JX624 at 6; JX1497 at 21; Tr. 1828:23–1829:23, 1833:9–1835:24.

determine if NetSuite would be open to an offer and the NetSuite board met to discuss that dinner,[384] Goldberg called Ellison on January 27, 2016.[385] During that conversation, Ellison told Goldberg that he would recuse from NetSuite's consideration of the transaction, and that NetSuite's decision was out of his hands.[386] Ellison did indicate that Oracle's intention was to retain NetSuite management and that he expected Hurd to run the company as a global business unit.[387]

This was not an act of control of the transaction itself, nor did it make overpayment likely. As I understand the Plaintiffs' argument to the contrary, they posit that this conversation foreclosed the Special Committee's ability to launch a hostile tender offer because Goldberg now knew that Oracle's intention was to keep management. *But Plaintiffs conceded that the Special Committee did not know about this conversation*, because Ellison walled himself off from the Special Committee.[388] Thus, the Special Committee's decision not to "go hostile" was its own.

---

[384] JX645 at 2–3.
[385] Tr. 834:5–9.
[386] Tr. 1833:9–1835:24.
[387] Tr. 1679:1–1680:15, 1829:24–1831:8.
[388] I do not mean to imply that it was best practice for Ellison not to report this conversation, but simply that it was not an exercise of control over the Special Committee.

### iii. Ellison Did Not Control the Transaction Through Catz

The Plaintiffs theorize that Ellison drove the deal through Catz, who provided faulty information to the Special Committee in order to cause Oracle to overpay for NetSuite.[389] They aver that Catz was not independent of Ellison because of their long friendship and because he controlled her employment.[390] This theory fails, as Plaintiffs failed to prove at trial that Catz, as a putative controller's surrogate, ran the negotiation process or took actions to advance Ellison's interests.[391]

First, the Special Committee, not Catz, ran the negotiation process. The Special Committee engaged its own independent and highly experienced advisors, performed its deliberations after management left its meetings, and questioned management's assumptions. In an attempt to show that Catz coopted the Special Committee's decision-making process on behalf of Ellison, the Plaintiffs point to an email from the Special Committee chairwoman James, post transaction, thanking Catz "for all the babysitting and strategy to get this done."[392] This tongue-in-cheek email simply thanks Catz for her time, not for her oversight. As the primary

---

[389] Pls.' Corrected Opening Post-Trial Br. 84–85, 88, 93–97, 101, Dkt. No. 795.

[390] *Id.* at 84.

[391] *See FrontFour Capital Grp. LLC v. Taube*, 2019 WL 1313408, at *22–25 (Del. Ch. Mar. 11, 2019) (examining director independence in a specific actual control analysis).

[392] Pls.' Corrected Opening Post-Trial Br. 101, Dkt. No. 795 (citing JX1800).

representative of Oracle management, Catz was fundamental to the ultimate deal. However, the Special Committee and its advisors ran the process.

Although Ellison openly discussed his opinions about NetSuite with Catz,[393] the Plaintiffs were unable to produce any persuasive evidence of collusion to orchestrate the merger. In short, there is nothing to indicate that Ellison attempted to, or did, assert control over Catz to control the negotiations or acquisition, to secure an overpayment or otherwise, as his surrogate.

Catz's actions with respect to the negotiations in fact demonstrate loyalty to the company, not Ellison's conflicted interests. During negotiations, Catz showed herself to be a tough negotiator on behalf of Oracle, who was prepared to let the deal die if it was not in Oracle's best interests to pursue. On June 11, 2016, after NetSuite countered Oracle's offer of $106.00 per share with an offer of $120.00 per share and a note that NetSuite had little room to negotiate, Catz and Oracle management recommended that the Special Committee *decline to counter*.[394] This was the course of action the Special Committee took.[395] When the deal was resuscitated by market turmoil stemming from the Brexit vote,[396] Catz and Oracle management

---

[393] Tr. 1957:20–1959:5.
[394] JX1046 at 1–2.
[395] PTO ¶ 74; JX1046 at 2.
[396] JX1104 at 1–2.

recommended diligence, not rapid reengagement.[397]   As the Special Committee noted, such a measured approach required time and posed the risk of closing the window of opportunity.[398]   Similarly, at the fourteenth meeting of the Special Committee on November 4, 2016, when determining whether to extend the tender offer deadline and raise Oracle's offer, Catz recommended standing firm, saying, "we are not going to pay a single penny more."[399]   Throughout the process, Catz agitated for Oracle to pay the *lowest* price possible and her advice led to several stalls that jeopardized the transaction.  These actions are incongruent with the theory that Catz drove the deal as an agent of Ellison.  Ellison did not control the transaction through Catz.

To recapitulate, at the time of the transaction, Ellison did not have hard control of Oracle.  He did not exercise control generally in regard to Oracle's operations. He did not attempt to assert control in the transaction by which Oracle acquired NetSuite, and as a director and officer abstained from participation in the transaction. He was, I find by a preponderance of evidence, a holder of potential control over a transaction in which he was interested.  Does such a finding mandate entire fairness review?

---

[397] JX1104 at 2; Tr. 1174:6–13.
[398] JX1104 at 2.
[399] Tr. 2478:6–17; JX1649 at 1.

The Defendants point to caselaw defining control over a transaction, outside the context of pure voting control, narrowly. To exercise actual control such that a minority stockholder is deemed a controller, she must "exercise[] such formidable voting and managerial power that, as a practical matter, [she] is no differently situated than if [she] had majority voting control."[400] In wielding such power, a minority stockholder deemed controller can "either (i) control . . . the corporation's business and affairs in general or (ii) control . . . the corporation specifically for purposes of the challenged transaction."[401] Because I have found neither, under this understanding, Ellison was not a controller and business judgment applies.

It is instructive to consider here, I think, the development of the fiduciary concept of the controller, starting with *Kahn v. Lynch*.[402] Delaware courts have long held that "'a shareholder owes a fiduciary duty only if it owns a majority interest in or *exercises control* over the business affairs of the corporation.'"[403] "'[A] plaintiff must allege domination by a minority shareholder through actual control of corporate conduct'" in order to show an exercise of control.[404] In *Kahn v. Lynch*,

[400] *In re Rouse*, 2018 WL 1226015, at *11 (quoting *Morton's Rest. Grp.*, 74 A.3d at 664–65) (internal quotations omitted).

[401] *Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020).

[402] 638 A.2d 1110 (Del. 1994).

[403] *Id.* at 1113–14 (quoting *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) (emphasis added)).

[404] *Id.* at 1114 (quoting *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989)).

the Delaware Supreme Court held that an interested squeeze-out merger by a controlling stockholder would undergo entire fairness review despite receiving "the informed approval of a majority of minority stockholders or an independent committee of disinterested directors."[405] The court reasoned that entire fairness was required in the squeeze-out context because minority stockholders may hesitate to vote in their own economic interest given the risk of subsequent retaliation by the controlling stockholder if they vote against the merger.[406] The court later held in *MFW* that a squeeze-out merger involving a conflicted controller could regain business judgment protection when conditioned *ab initio* on both the approval of an independent, adequately empowered special committee that fulfills its duty of care *and* the informed, uncoerced vote of a majority of the minority stockholders.[407]

Eight years after *Lynch*, then-Vice Chancellor Strine extended the reach of the doctrine of inherent coercion, in *In re Cysive*.[408] As in *Lynch*, the transaction at issue in *Cysive* was a conflicted squeeze-out merger involving an alleged controller.[409]

---

[405] *Id.* at 1117. In *Kahn*, the court found that the controller had exercised actual control over the company despite an ownership stake of only 43.3%. *Id.* at 1113-17.

[406] *Id.* at 1116.

[407] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018) (clarifying that a plaintiff can plead a duty of care violation only by showing the special committee acted with gross negligence, not by merely questioning the sufficiency of price).

[408] 836 A.2d 531 (Del. Ch. 2003).

[409] Accounting for options and holdings by family members, plaintiffs alleged holdings as high as 44%. *Id.* at 535.

However, rather than assess the minority stockholder's actual control of the company, the *Cysive* Court looked to the purported controller's ability "to be the dominant force in any contested Cysive *election*" and the inherently coercive threat that ability presented "to the independent directors and public stockholders" in the squeeze-out merger context.[410]  In reaching this conclusion, the Court held:

> [I]t cannot be that the mere fact that [the controller] did not interfere with the special committee is a reason to conclude that he is not a controlling stockholder . . . . the analysis of whether a controlling stockholder exists must take into account whether the stockholder, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes.[411]

This Court's decision in *Ezcorp* also extended the theory of inherent coercion, this time from controlled squeeze-out mergers to *all* conflicted transactions involving a controller.[412]  *Ezcorp* involved a dual class share structure in which an individual holding a minority equity position nonetheless retained 100% of the company's voting power—thus, the defendant had hard control.[413]  There, the challenged transactions involved consulting agreements between the company and entities affiliated with the controlling stockholder.[414]  After a thorough and scholarly

---

[410] *Id.* at 552–53 (emphasis added).
[411] *Id.*
[412] *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245 (Del. Ch. Jan. 25, 2016).
[413] *Id.* at *2.
[414] *Id.* at *2–7.

72

review of the caselaw, the Court found that entire fairness was the appropriate standard of review at the pleadings stage.[415]

Following *MFW* and *Ezcorp*, this Court has issued relatively few post-trial opinions involving challenges to conflicted controller transactions.[416] Each of these cases found the principal defendant to be a controller[417] based on a combination of stock holdings and, importantly, affirmative actions taken to control the transaction. Cases more analogous to the situation here have also survived a motion to dismiss.[418] However, they have done so with the benefit of plaintiff-friendly inferences. Indeed, buoyed by such inferences, the present case survived a motion to dismiss in which I found that Plaintiffs had pled sufficient facts to support, at that stage of the litigation, the allegation that Ellison was a controller.[419] I now have, however, a full trial record on which to assess Ellison's attempt to control this transaction, or lack thereof.

Based on the facts produced at trial as laid out above, and applying the doctrine of our caselaw as I understand it, I determine that Ellison did not function

---

[415] *See id.* at *11–30.
[416] *Basho Techs.*, 2018 WL 3326693; *FrontFour*, 2019 WL 1313408; *In re Tesla Motors, Inc. Stockholder Litig.*, 2022 WL 1237185 (Del. Ch. Apr. 27, 2022), *judgment entered sub nom. In re Tesla Motors, Inc.* (Del. Ch. 2022); *In re BGC Partners, Inc. Derivative Litig.*, 2022 WL 3581641 (Del. Ch. Aug. 19, 2022), *judgment entered sub nom. In re BGC Partners, Inc.* (Del. Ch. 2022).
[417] With the notable exception of *Tesla*, where the Court assumed Elon Musk to be a controller but ultimately found that the transaction occurred at a fair price. *In re Tesla Motors*, 2022 WL 1237185.
[418] *See, e.g., Voigt*, 2020 WL 614999 (involving similar allegations of a controller who caused the company to acquire a controller affiliate).
[419] *See In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331 (Del. Ch. Mar. 19, 2018).

as a controller here. He neither possessed voting control, nor ran the company *de facto.* He likely had the *potential* to control the transaction at issue, but made no attempt to do so; in fact, he scrupulously avoided influencing the transaction. In addition, the transaction was negotiated by a special committee of independent directors who hired independent advisors. The Special Committee vigorously bargained for price and demonstrated a willingness to walk away from the transaction. I find, in light of these facts, that this is not a controlled transaction. Accordingly, business judgment applies, unless I determine that the Defendants breached fiduciary duties arising outside the controller context, allegations of which I address below.

The Plaintiffs posit that Defendants committed fraud on the Special Committee, disabling its ability to negotiate with NetSuite. I address that theory, below.

### 3. Fraud on the Board

To shift the standard of review governing the Transaction from the business judgment rule to entire fairness, Plaintiffs posit that Ellison and Catz perpetrated a fraud on the board. Specifically, they argue that "Ellison and Catz manipulated the deliberative process of the Board and the Special Committee, by not disclosing

74

material facts relating to the value of NetSuite and their interactions with NetSuite."[420]

To shift the standard of review under a "fraud on the board" theory, Plaintiffs must prove 1) that the fiduciary was materially interested, 2) that the board was inattentive or ineffective, 3) that the fiduciary deceived or manipulated the board, 4) that the deception was material, and 5) that the deception tainted the decision-making process of the board.[421] At minimum, for a fraud on the board claim to result in entire fairness, a defendant must have manipulated a supine board.[422] Here, the first element is satisfied.

"[A]n omission is 'material' to a board if the undisclosed fact is relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking."[423] In other words, the Court must determine if a defendant

---

[420] Pls.' Corrected Opening Post-Trial Br. 88, Dkt. No. 795.

[421] *See In re Pattern Energy Grp. Inc. Stockholders Litig.*, 2021 WL 1812674, at *33 (Del. Ch. May 6, 2021) (providing the standard for fraud on the board at the motion to dismiss stage); *see also City of Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896, *10, 15, 17 (Del. Ch. Nov. 30, 2020).

[422] *Pattern Energy*, 2021 WL 1812674, at *34.

[423] *Id.* at *33 (quoting *In re Mindbody, Inc.*, 2020 WL 5870084, at *23 (Del. Ch. Oct. 2, 2020)). "[T]he term "material," when used in the context of a director's obligation to be candid with the other members of the Board, is distinct from the use of the term 'material' in the quite different context of disclosure to stockholders in which [a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *City of Fort Myers Gen. Employees' Pension Fund v. Haley*, 235 A.3d 702, 719 (Del. 2020) (internal quotation omitted).

caused a deprivation of material information that corrupted the board or committee's decision making process.[424]

As explained below, at trial, Plaintiffs were unable to prove that Ellison or Catz perpetrated a fraud on the board or, more cogently, on the Special Committee.

### a. Ellison Did Not Defraud the Oracle Board or the Special Committee

The Plaintiffs contend that Ellison misled the Special Committee by failing to disclose to the board or the Special Committee (i) his critiques of NetSuite's business strategy, (ii) the business strategies that he planned to implement at NetSuite following the Merger, and (iii) his January 27, 2016 phone call with Goldberg.[425] These supposed omissions fail to convince me that Ellison perpetrated a fraud on the board. I assess them in turn.

### i. Critiques of NetSuite's Business Strategy

Plaintiffs first argue that Ellison materially misled the Oracle board by failing to disclose his belief that NetSuite was on a path to be "crushed" by Oracle if it did

---

[424] *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *20 (Del. Ch. Oct. 27, 2020).
[425] Pls.' Answering Post-Trial Br. in Response to the Opening Post-Trial Br. of Defs. Safra A. Catz and Lawrence J. Ellison 44–45, Dkt. No. 813.

76

not correct its course.[426]  Plaintiffs contend that NetSuite was moving up-market while Oracle, with Fusion, was moving down-market.[427]  The inevitable clash, which Plaintiffs aver was already occurring and NetSuite was going to lose,[428] was going to depress NetSuite's future share price, and Ellison knew this.[429]

The Plaintiffs' theory that Ellison materially misled the board by not voicing his criticisms of NetSuite relies, in part, on his supposed knowledge that competition between Oracle and NetSuite in the future would be such that only one could thrive. It also relies on a lack of action by NetSuite to adjust course in response to Ellison's advice to NetSuite's management, supposedly dooming NetSuite's prospects. Plaintiffs put forward a significant amount of evidence regarding competition, and I include the most compelling examples below.  However, in light of the evidence below, I find that the two companies were not significant competitors, although they competed at the margins.  Further, Ellison's critiques of NetSuite's business strategy would not have been material to the Special Committee because NetSuite was in the process of implementing them.

---

[426] Pls.' Corrected Opening Post-Trial Br. 91, Dkt. No. 795.
[427] *Id.* at 90–91.
[428] *Id.* at 22–27, 29–32.
[429] *Id.* at 90–91; Pls.' Answering Post-Trial Br. in Response to the Opening Post-Trial Br. of Defs. Safra A. Catz and Lawrence J. Ellison 30, Dkt. No. 813.

In April 2015, Oracle executive Rod Johnson reported to Oracle's Committee on Independence Issues regarding competition between Oracle and NetSuite.[430] He noted that although NetSuite "competes"[431] were growing in the upper mid-market, they were still a low percentage of potential ERP sales.[432] However, he expected such competes to grow in number as Oracle grew coverage in the mid-market.[433] He noted that Oracle "dominate[ed]" in the larger opportunities.[434] Overall, however, Johnson did not believe that NetSuite was a "significant or major" Oracle competitor.[435]

In May 2015, Jeff Henley, a salesman and Vice Chairman of the board, was seeing NetSuite "trying to come up market" while Oracle, with Fusion, was going "down to smaller and smaller" companies.[436] In an email to a fellow Oracle salesman, Henley agreed to call or email any smaller company that was thinking of making the switch to Oracle.[437] As an exclamation and to show his enthusiasm Henley wrote, "Love crushing Ne[t]Suite!"[438]

---

[430] JX427.

[431] That is, Johnson used "compete" as a noun, meaning what native speakers of English might refer to, quaintly, as "an instance of competition." I reluctantly adopt Johnson' usage throughout.

[432] JX427 at 17.

[433] JX427 at 17.

[434] JX427 at 17.

[435] JX440 at 1.

[436] Tr. 22:3–13.

[437] JX933.

[438] JX933 at 1.

In August 2015, Catz received a presentation deck that showed 26% of Oracle's cloud wins in the first three fiscal quarters were over NetSuite.[439] That presentation, however, did not state the number of competes or losses.[440] Later, in August 2016, an Oracle presentation on ERP wins and losses showed Oracle as winning 75% of the deals they compete in against NetSuite in the upmarket and 58% in the mid-market.[441] There was no discussion of how these win-rates relate to either company's broader deal flow.

When discussing the anti-trust risks of the Proposed Transaction, Kehring wrote,

> I don't see anything below that is harmful from an antitrust perspective. the only area I think we should be careful in is not to suggest different markets for SMEs, enterprises etc but to position the different target customer categories as fluid and constraining each other and part of a broader market. While it might be tempting to say that [NetSuite] serves e.g. only smaller businesses and therefore they are in a different antitrust market and there is no or very small overlap with us, that type of rigid segmentation is something we have consistently argued against since Peoplesoft.[442]

Oracle displayed Fusion's functionality at the OpenWorld conference in September, 2016.[443] This provided NetSuite the opportunity to investigate its soon

---

[439] JX512 at 9.
[440] *See* JX512 at 9.
[441] JX1471 at 4.
[442] JX765 at 1 (errors in original).
[443] Tr. 2742:3–17, 2867:2–5.

79

to be sister product.[444]  A NetSuite employee wrote that Fusion was a better product than he had thought; it was indeed a ground up re-write, but not a unified codebase.[445]  Fusion was meant to be adopted piecemeal to allow a gradual transition for existing customers, which meant NetSuite would "continue to have an opportunity to differentiate and sell to customers who value a unified suite rather than a well-integrated one."[446]  As far as customer targets, the employee wrote, "there is currently more overlap . . . than I had previously thought," "they're starting by getting good for the mid-market and then adding sophistication to move up," and "[t]wo-tier ERP is a focus for them too."[447] That said, he also noted that the biggest limitations in the mid-market for Fusion were that "platform-implementations may be too expensive," the sales team may not be good at reaching the mid-market, and high operations cost.[448]  The employee's conclusion was "I think their functionality and usability for the upper mid-market means we should focus on the lower- and mid-mid-market and the larger small businesses — the 20–1000 employee market."[449]

---

[444] *See* JX1623.
[445] JX1623 at 1.
[446] JX1623 at 1.
[447] JX1623 at 3.
[448] JX1623 at 3.
[449] JX1623 at 3.

As they contend Oracle was pushing downwards, the Plaintiffs argue that NetSuite was pushing upwards and out of its core market. They cite to NetSuite's 2016 Plan, which calls for that company to "double down on areas of Enterprise success,"[450] a May 5, 2016 diligence presentation which noted, "moving up market and going global with One World" was a part of NetSuite's winning strategy,[451] and a post-acquisition presentation which noted that prior to acquisition, NetSuite was "making a big push to move upmarket" but after acquisition it was "re-focusing on the mid-market and the Suite."[452]

Although there was competition between Oracle and NetSuite at the margins, I find that the two were not significant competitors. To quote NetSuite's other founder, Goldberg, "We used to have a saying about Oracle ERP, that if both of us were in the same room, one of us was in the wrong room."[453] When viewed as a percentage of NetSuite deals in Q1 2014 and Q1 2015, Oracle was a competitor in 3% and 2% of NetSuite deals respectively.[454] NetSuite won 50% of the 28 total

---

[450] JX596 at 26.
[451] JX889 at 3.
[452] JX1974 at 13.
[453] Tr. 941:2–4.
[454] JX430 at 2; Tr. 746:12–748:16; *see also* Tr. 2688:8–2690:9 ("9,000 sales opportunities that occurred over that six-quarter period. Oracle was identifiably present at the same firm about 11 percent of the time, 942 opportunities. And of those, Oracle won the opportunity — they got the contract — 2 1/2ish percent of the time. And this, I think, gives you some initial sense that, yes, Oracle and NetSuite do encounter each other, but it's not a big part of NetSuite's sales book. And, in fact, the encounters between Oracle and NetSuite are relatively rare.").

deals and 55% of the annual recurring revenue.[455] When looking at the six financial quarters of competition from 2015 to mid-year 2016, out of 9,000 NetSuite sales opportunities, Oracle was identifiably present 11% of the time and Oracle won less than a quarter of those interactions.[456] The two companies excelled in different markets, and it was not fraudulent for Ellison not to affirmatively declare otherwise to the Special Committee.

At trial, the Plaintiffs suggested that I should confine my analysis to the overlapping market segment.[457] In that segment, they argue, there was increasing competition between Oracle and NetSuite, and NetSuite was fighting a losing war.[458] In my view, Plaintiffs' position is logically flawed and incongruent with the data.[459]

First, despite the Plaintiffs' protestations,[460] NetSuite had not abandoned its down-market to push upwards. Plaintiffs' evidence for this abandonment was a single bullet point on NetSuite market strategy in the notes of an Oracle employee who attended a diligence presentation given to Oracle.[461]

---

[455] JX430 at 2.
[456] Tr. 2688:8–2690:9. This dataset was likely overinclusive of competition as it did not take into account instances where NetSuite and Oracle were bidding for different projects within the same company. Tr. 2690:23–2691:17.
[457] Tr. 2722:5–2741:12.
[458] Tr. 2722:5–2741:12.
[459] *See* Tr. 2695:2–2696:7.
[460] Tr. 2719:22–2720:12 (citing JX921 at 5).
[461] Pls.' Corrected Opening Post-Trial Br. 23, Dkt. No. 795 (quoting JX921) ("Do not go after small companies (<100 employees)").

In fact, NetSuite was in the process of implementing changes to address Ellison's 2015 concerns and the Special Committee knew about these efforts. Though he disagreed at first, Goldberg came around to Ellison's way of thinking.[462] NetSuite developed project Atlas, later marketed as SuiteSuccess, to increase its profitability and ability to scale.[463] Rather than focusing on expensive one-off customizations, the purpose of project Atlas was to create templates for industries—"verticals"—and subsections of industries—"micro-verticals"—that could be tailored to each customer with little customization.[464] Atlas and the verticalization of NetSuite were priorities of NetSuite following the discussion with Ellison and part of the company's "Winning Growth Strategy."[465] However, individual verticals take time and NetSuite planned to build one to two per year,[466] starting with the retail apparel vertical.[467]

Plaintiffs contend that NetSuite failed to abandon its push upmarket, noting that "moving up market and going global with OneWorld" was part of NetSuite's

---

[462] JX525 at 3.
[463] Tr. 1044:9–1045:1, 930:12–932:12.
[464] Tr. 916:4–917:1.
[465] *See* JX889 at 3; *see also* Tr. 752:17–754:17.
[466] Tr. 921:4–16, 752:17–53; JX546 at 2 (indicating that NetSuite intended first to adopt a pilot industry for its verticalization initiative, and then develop 1 to 2 additional verticals per year); JX584 at 13.
[467] Tr. 757:8–15, 930:20–931:1.

"Winning Growth Strategy."[468]   That same presentation included "Key Business Drivers" such as "[g]rowing [the] average selling price in the mid-market" in part by "selling to larger, mid-size enterprises" and increasing enterprise customer count as well as deal size.[469]  Plaintiffs further noted NetSuite's target market, the "Fortune 5 Million: US Enterprise & Mid-Market SMBs," included firms with over 1000 employees as well as the substantial percentage of its revenue, 15%, that NetSuite derived from these large businesses.[470]

NetSuite did have some large customers and, for a time, it was moving up-market.  However, NetSuite tempered its indiscriminate move upmarket when it began developing Atlas.[471]  Further, of the two initiatives, Atlas and verticalization in the mid-market was the initiative that got more resources.[472]  NetSuite was not designed for "large" customers[473] and James, from her own experience, noted that the software did not function above a certain number of users.[474]  NetSuite sought larger customers opportunistically, but many of their enterprise clients were "tier

[468] Pls.' Answering Post-Trial Br. in Response to the Opening Post-Trial Br. of Defs. Safra A. Catz and Lawrence J. Ellison 15, Dkt. No. 813 (citing JX889 at 3).
[469] JX889 at 18.
[470] Pls.' Answering Post-Trial Br. in Response to the Opening Post-Trial Br. of Defs. Safra A. Catz and Lawrence J. Ellison 15–16, Dkt. No. 813 (citing JX1242 at 23, 7).
[471] Tr. 953:2–21.
[472] Tr. 953:2–21.
[473] Tr. 874:23–876:3.
[474] Tr. 1304:6–1305:2.

two" deployments of NetSuite to subsidiaries.[475]  Further, there was no indication that NetSuite's win rate against Oracle was on a downward trend.[476]

The ambiguous nature of competition in the cloud segment described above in perhaps excessive detail demonstrates that Ellison did not defraud the Special Committee by not providing it with his views.  Beyond this, the Special Committee performed diligence and was not supine or naive.  James was an experienced executive who worked at Intel for decades and presided over a myriad of acquisitions.[477]  Conrades was a similarly experienced executive who "spent 61 years marketing and selling hardware and software to business enterprises and governments around the world."[478]  Panetta, a former CIA director and Secretary of Defense, lacked the executive experience of James and Conrades but brought poignant analytical skills to the Special Committee.[479]

The Special Committee brought their collective experience to bear in the performance of diligence.  At the Special Committee's first meeting on April 8, 2016, after Oracle management presented on the strategic rationale of the acquisition of NetSuite, the Special Committee requested a "more in depth presentation" of the

---

[475] Tr. 921:17–922:13, 1850:10–17; JX903 at 1.
[476] Tr. 2741:7–12 ("I did test whether or not Oracle generally had a trend in increasing win rates, and that was not significant. It wasn't even close.").
[477] Tr. 192:2–21.
[478] Tr. 177:19–190:16.
[479] Tr. 191:4–192:1.

topic and potential alternatives.[480]  On May 5, 2016, James attended a six hour in-person diligence meeting with the Special Committee's advisors, members of Oracle management (not including Catz), and representatives of NetSuite.[481]  That meeting included a discussion of NetSuite's "market positioning" and "competitive environment,"[482] and on May 13, 2016, James reported the "potentially complimentary nature" of Oracle and NetSuite as well as their "respective addressable markets."[483]  On May 20, 2016, Oracle management and Moelis separately presented to the Special Committee on the strategic rationale of acquiring NetSuite and potential alternatives.[484]  In its presentation, Moelis noted Oracle's lack of a small and medium business ERP product and that NetSuite could "address [Oracle's] shortcomings in Cloud ERP."[485]  The Special Committee's advisor also noted the importance of quick action given the lack of competitors in that market segment.[486]  In consideration of the presentations, the Special Committee came to

---

[480] JX779 at 2–3.

[481] PTO ¶ 68; JX1265.

[482] JX1265 at 5.

[483] JX931 at 1.

[484] PTO ¶ 69; Tr. 1155:24–1157:14 ("I thought Moelis's presentation was extraordinarily helpful. This presentation was very detailed, and it looked at the market, and they had — they had their own assessment of Oracle, which I think was very important for us to get somebody else's view of what Oracle — you know, how Oracle's Fusion is seen in the market, and alternatives, and, you know, what's out there."), 592:21–594:9.

[485] JX977 at 33; Tr. 2349:16–2350:8, 2377:4–22, 2372:15–2374:10.

[486] Tr. 2356:12–2357:23 ("Again, and this also was validated in our third-party research and our own understanding of the market, this market was evolving quickly.  I think it was very, very

the conclusion that "an acquisition of [NetSuite] could be highly beneficial to [Oracle], that alternatives for participation in this market segment were unattractive or not readily or timely available and that an acquisition of [NetSuite] could fill a strategic gap for [Oracle] that it was important for [Oracle] to address."[487] At this point, one and a half months after its formation, the Special Committee determined that it was ready to consider making an initial offer for NetSuite.[488]

In sum, I do not find any evidence that Ellison or Catz breached fiduciary duties by "concealing" the extent of competition between Oracle and NetSuite.

## ii. Post-Closing Business Strategies

Plaintiffs contend that Ellison's failure to disclose his post-close business strategies for NetSuite was a fraud on the board because, if followed, Ellison's strategies would entail "significant cost and risk, as well as reduced revenues," which were not accounted for in the analyses given to the Special Committee.[489] Per

---

important while there was still a lot of untapped issues, I think we had approximately like 50 percent of the market was still greenfield, it was important to have your solution now, because a lot of other people saw this market as highly attractive too."); JX977 at 33–35.

[487] JX949 at 2.

[488] JX949 at 2.

[489] Pls.' Corrected Opening Post-Trial Br. 93, Dkt. No. 795.

Plaintiffs, the evidence for this claim is found in Ellison's January 27, 2016 phone call with Goldberg.[490]

As discussed below, in acquiring NetSuite, Oracle followed its usual practice in M&A transactions. Typically, in Oracle's acquisitions, post-close plans and structuring are not decided until after a deal is signed and Oracle's Financial Planning and Analysis team draws up an operating budget for the soon to be acquired entity. Therefore, Ellison's thoughts on the post-close running of NetSuite, addressed to Goldberg or otherwise, would have had no impact on the Special Committee's deliberations and therefore were immaterial.

Oracle institutionalized its M&A strategy in 2006 after Kehring took over Corporate Development.[491] This included the implementation of a standard framework to assess potential targets.[492] Corporate Development kept tabs on potential takeover targets and frequently presented them to the executive team.[493] Once a potentially viable target was lined up and the financial framework was ready, Corporate Development sat down with leadership, typically Catz and Hurd, to discuss the use of the business as part of Oracle.[494] To assess a potential acquisition

---

[490] *Id.* at 92.
[491] Tr. 529:11–531:2, 549:20–23, 551:14–552:1.
[492] Tr. 569:14–570:8, 529:11–531:2, 549:20–23, 551:14–552:20.
[493] *See* Tr. 455:5–14.
[494] Tr. 550:2–14.

88

target, the Corporate Development team created an incremental model based on public information and any diligence that had been performed.[495] "The purpose of the incremental model is to reflect the incremental revenue and expenses as a result of owning the target by which [they thought], over a five-year horizon, [Oracle could] accomplish."[496] These models were not operating plans; rather, they were financial plans.[497] Corporate Development projected the potential target's revenue based on its prior performance rather than its expected performance based on synergies and cross-sales with Oracle products.[498] However, when examining costs, the model took into account additional costs to Oracle as well as synergies and savings.[499] Thus, the incremental cost to Oracle, such as hiring additional personnel within Oracle's various divisions to accommodate the putative target, were added to the model.[500] Similarly, cost savings to the putative target, such as use of Oracle's database that the company was previously paying for, were incorporated into the model.[501] Oracle's prior acquisitions, overall corporate activities, and financial

---

[495] Tr. 550:22–551:6.
[496] Tr. 548:7–17.
[497] Tr. 550:15–21.
[498] Tr. 554:11–555:1 ("Q. Does Oracle include the projected revenue from those cross-sales in its incremental models? A. No. On the revenue side, in order to be conservative, we only project out the revenue of the acquired company's products and services.").
[499] Tr. 556:7–20.
[500] Tr. 555:17–556:20.
[501] Tr. 555:17–20, 501:19–502:12.

results helped to inform the inputs for the model, which were ultimately provided by Catz and Hurd.[502] As due diligence progressed and new information came to light, the model was updated to reflect that information.[503]

In addition to the incremental model, the Corporate Development team assessing an acquisition performed several other analyses.[504] These included a discounted cash flow analysis, discounted future value analysis, accretion/dilution analysis, comparable publicly traded company multiples analysis, comparable M&A transaction multiples analysis, review of 52-week highs, and institutional analyst price targets analysis.[505]

While the incremental model was Oracle's primary assessment tool before signing and remained an important barometer post-acquisition,[506] Oracle management's modeling method changed post-signing. Post-signing, Oracle's Financial Planning and Analysis team built a "bottoms-up" operating budget.[507] The operating budget treated pre-existing expenditures differently than an incremental model would.[508] As such, the operating budget assigned to the target a portion of

---

[502] Tr. 557:1–558:1.
[503] Tr. 557:1–8.
[504] Tr. 567:5–24.
[505] Tr. 567:18–24.
[506] Tr. 551:14–552:14.
[507] Tr. 540:24–542:1, 225:1–18.
[508] Tr. 540:24–545:6.

90

Oracle's pre-existing expenditures useful to that company.[509] For example, the incremental model would not include a cost for use of Oracle's database or previously unused Oracle office space, where the operating budget would.[510]

The NetSuite transaction followed the same framework as Oracle's other deals. Oracle management prepared an incremental model, discounted cash flow analyses, and multiples based on precedent transactions.[511] Kehring with the assistance of Catz and Hurd set the assumptions underlying these models.[512] On receipt of more information, Catz revised the incremental model of NetSuite downwards taking a more *conservative* view of NetSuite's value.[513] As a result of Special Committee questioning and push-back, she later acknowledged that this downwards shift was an analytical mistake[514] and provided the revised model to the Special Committee alongside two other models.[515] In doing so, Catz left the decision of what model to follow to the Special Committee, and the transaction followed the usual pre-signing path.

---

[509] Tr. 540:24–545:6.
[510] *See* 501:19–504:7, 1543:3–1544:5.
[511] JX979 at 1–2; JX980.
[512] Tr. 479:16–480:12, 492:20–493:23.
[513] JX1183 at 7–8; Tr. 1481:2–1482:9.
[514] Tr. 1485:1–22.
[515] JX1206 at 2; JX1204 at 2–5.

91

Further, Ellison's failure to reveal managements' post-closing plans was not material to Oracle or the Special Committee's deliberation process. Post-close, Oracle invested heavily in NetSuite, focused on international expansion, and continued the verticalization efforts.[516] There is no reason to think that these actions were taken to decrease Oracle/NetSuite's value; to the contrary, all the fiduciaries had an incentive to maximize NetSuite's value to Oracle, post-acquisition.

The same reasoning, I note, applies to Plaintiffs' allegations on this matter concerning Catz.

### iii. Ellison's "Assurances" to Goldberg

Plaintiffs contend that Ellison's failure to inform the board of the "assurances" he made to Goldberg were a fraud on the board because they deprived the Oracle board of negotiating leverage.[517] In their conversation on January 27, 2016, initiated by Goldberg, Ellison stated his expectations for how Hurd would treat NetSuite. Similarly, he said that Oracle's intent was to continue to employ NetSuite management. This was consistent with Oracle's standard practice in many of its large acquisitions, which was to treat the acquired companies as global business

---

[516] JX1667; JX1785; Tr. 294:2–11, 1499:18–1500:5, 1527:10–1528:18.
[517] Pls.' Corrected Opening Post-Trial Br. 94, Dkt. No. 795.

units.[518]  This conversation should have been, and was not, disclosed to the board or Special Committee, presumably because Ellison was recused from discussions with the board over NetSuite.  Though it would have been prudent for Ellison to err on the side of greater disclosure, Plaintiffs did not show, and logic does not dictate, that Ellison's failure to disclose the telephone conversation to the Special Committee corrupted the Special Committee's process.

Plaintiffs' theory has already been addressed and rejected; they contend that the failure to disclose this conversation gave up Oracle negotiating leverage by foreclosing hostile negotiation tactics[519] and "greased the skids for a deal."[520]  As discussed earlier, the Special Committee independently chose not to engage in hostile negotiation.

In fact, even if Ellison's non-committal statements assuaged Goldberg's concerns, I fail to see how this is an issue for *Oracle's* Special Committee such that it tainted *their* process.  In other words, Ellison's effort to open Goldberg's mind to a potential transaction, if the call can be characterized as such, in no way impacted

---

[518] Notice of Lodging of Dep. Transcripts and Video Recordings Ex 19, at 75:6–16, Dkt. No. 730; *see* Tr. 1452:21–1453:4 (highlighting that Oracle had eight global business units at the time of the NetSuite acquisition).

[519] Pls.' Corrected Opening Post-Trial Br. 94, Dkt. No. 795.

[520] Pls.' Answering Post-Trial Br. in Response to the Opening Post-Trial Br. of Defs. Safra A. Catz and Lawrence J. Ellison 36, Dkt. No. 813.

the Special Committee's deliberations about or negotiations regarding the transaction.

### b. Catz Did Not Defraud the Oracle Board or the Special Committee

Plaintiffs contend that Catz breached her fiduciary duties by failing to disclose her "assurances to Goldberg," by failing to inform the board and the Special Committee of her "prohibited price discussion" with Nelson, by not "truthfully and completely" answering Moelis's questions about the competitive landscape, and by providing "Moelis and the Special Committee with phony projections."[521]

### i. Catz's "Assurances" to Goldberg

Plaintiffs contend that Catz made assurances to Goldberg and that these assurances deprived the Special Committee of negotiating leverage.[522] Underlying this claim are Catz's May 26, 2016,[523] and June 22, 2016,[524] calls with Goldberg, which she did not report to the Oracle board.[525] Plaintiffs aver that "Catz [was] . . .

---

[521] Pls.' Corrected Opening Post-Trial Br. ii, 94–99, Dkt. No. 795.
[522] *Id.* at 94.
[523] JX988; Tr. 784:9–786:15.
[524] Tr. 1633:18–1636:17.
[525] Pls.' Corrected Opening Post-Trial Br. 94, Dkt. No. 795.

in selling mode when speaking to Goldberg" and "NetSuite was empowered to demand a high price, secure in the knowledge that" Oracle would not "take a hard line in negotiations, criticize NetSuite, or otherwise go public or go hostile."[526]  I do not find this theory consistent with the evidence.

During the first conversation on May 26, 2016, Goldberg expressed a lack of desire to sell NetSuite, that he understood his fiduciary duties, and that Oracle would need to offer a good price.[527]  Catz did try to overcome his unwillingness to sell by stating that the plan was to keep NetSuite independent.[528]  During the second conversation, Catz testified credibly that the pair did not discuss the transaction.[529] As stated in respect to Ellison, because the Special Committee was unaware of the conversations, its decision not to go hostile was its own.  No leverage was lost.  The Special Committee process was not corrupted. While the conversations should have been reported, failure to do so did not amount to a fraud on the Special Committee.

---

[526] *Id.*
[527] JX988; *see also* Tr. 784:9–786:15.
[528] Tr. 784:16–19, 982:4–21.
[529] Tr. 1649:14–1650:7, 1636:18–1637:4.

### ii. Price Discussion with Nelson

Plaintiffs contend that Catz negotiated with Nelson and that the discussion of a Concur multiple anchored price negotiations at $125 per share.[530] From there, they contend that this discussion anchored Catz's thinking in the creation of projections and that the Special Committee should have been made aware of this.[531]

I have found that despite the mention of the Concur multiple, Catz and Nelson did not negotiate a price for NetSuite. Catz did not mention the requested multiple to the Special Committee. I cannot find that the omitted information was material to the Special Committee so as to justify a finding of fraud on the board.

The Special Committee made the opening bid, and its deliberative process was clear. Catz and Oracle management presented their analyses to the Special Committee and recommended an opening bid of $100.00 per share.[532] That figure was based on NetSuite's 52 week high of $99.73 and the roughly 25% premium over the trading price that $100.00 per share represented.[533] Moelis reviewed the models, questioned management about them, and concluded they were reasonable.[534] After

---

[530] Pls.' Corrected Opening Post-Trial Br. 95–96, Dkt. No. 795.
[531] *Id.*
[532] PTO § 70; JX979 at 1–2.
[533] Tr. 618:21–621:3, 1459:10–1465:20; JX980 at 7.
[534] Tr. 2389:16–2393:9, 2398:20–2399:22 ("Yeah, we believed them — we certainly took note of them. They were reasonable. From a cost savings perspective, they struck us as reasonable. And

management left the meeting,[535] Moelis gave its report and analyses on public market price targets, revenue multiples, and precedent transactions.[536] Based on its own analyses, Moelis also suggested $100.00 per share.[537] Their reasoning rested on similar grounds: NetSuite's 52 week high, trading multiples for SaaS companies, and the psychological necessity of starting with a "three-figure" price per share.[538] Despite initially settling on $102.00 to $105.00 per share, the Special Committee reflected on the advice of Oracle management and its advisors and offered $100.00 per share.[539] Catz's and management's recommended first offer was in line with that of Moelis's independent advice.

While Catz should have informed the Committee of the "Concur multiple" suggested by Nelson, Catz's actions did not materially mislead the Oracle Special Committee or corrupt its proceedings.

---

then we looked at the revenue scale, interestingly enough, if I remember correctly, it was maybe even conservative."); *see* JX975.

[535] JX979 at 2.

[536] JX979 at 2; JX975.

[537] *See* Tr. 2420:12–22.

[538] Tr. 2419:3–2420:22.

[539] JX979 at 2; Tr. 1163:6–1165:6; 56:8–57:5; 215:9–216:21.

### iii. Competitive Landscape

As with Ellison, Plaintiffs contend that Catz withheld knowledge of competition between Oracle's fusion product and NetSuite, and that she provided Moelis with inaccurate information on Oracle's cloud ERP capabilities.[540]  I have already found, above, that the Special Committee process was not corrupted by misleading the Special Committee as to competition between the products.

The Special Committee and its advisors were apprised of the level of competition between NetSuite and Oracle.  By virtue of their presence at the meeting, the members of the Special Committee were aware of Olsen's reports at Porcupine Creek.[541]  Similarly, Moelis provided the Special Committee with analyst reports highlighting the potential of competition between the Oracle and NetSuite.[542]  Overall, the level of competition was not deliberately hidden from the Special Committee, on the contrary, the Special Committee was briefed and aware of the two companies' positions within the market.  The Special Committee and its advisors were free to draw on or request information from a broad range of sources including those cited by the Plaintiffs. Catz was not the exclusive source for this information and, given the limited competition between the two entities, Catz did

---

[540] Pls.' Corrected Opening Post-Trial Br. 96–97, Dkt. No. 795.
[541] JX624; JX614; JX637.
[542] Tr. 2444:1–2445:20; JX1131.

not breach her fiduciary duties with respect to non-disclosure of materials relating to the competition between NetSuite and Oracle.

## iv. "Phony" Projections

Plaintiffs contend that "Catz oversaw the creation of artificial and inflated financial projections."[543] The incremental model for NetSuite, they claim, was overly aggressive and "did not reflect Ellison's actual plans for NetSuite" or the eventual operating budget.[544] I have already rejected this allegation regarding fraud on the Special Committee by Ellison; the allegations against Catz suffer the same fate.

As discussed above, Oracle followed its M&A playbook in acquiring NetSuite. The seeming incongruence between the incremental model and the operating budget are therefore unsurprising, as the two had entirely different purposes.[545] By Plaintiffs own contention, Catz's analytical role concluded with bidding.[546] Overall, the Plaintiffs contentions boil down to an assertion that Catz's model did not match what Oracle ultimately did with NetSuite and that Catz used

[543] Pls.' Corrected Opening Post-Trial Br. 97, Dkt. No. 795.
[544] *Id.*
[545] Tr. 501:19–504:7, 540:24–545:6, 1543:3–1544:5.
[546] Pls.' Corrected Opening Post-Trial Br. 62, Dkt. No. 795.

incorrect, aggressive assumptions.[547]   The record does not indicate that Catz

breached fiduciary duties in this regard, or that the Special Committee was defrauded

by Catz.


## III. CONCLUSION


This transaction was negotiated at arm's length by a fully empowered Special

Committee.  Ellison was conflicted, but recused from the acquisition process.  He

did not exercise control over the transaction, nor did he or Catz materially mislead

or defraud the Special Committee so as to taint the process.  After the foregoing

review of the post-trial record, I find that business judgment obtains.  Accordingly,

I find for the Defendants.

---

[547] *Id.* at 97–98.